1

```
 1                IN THE UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF ARKANSAS
 2                          WESTERN DIVISION

 3

 4   UNITED STATES OF AMERICA      .
                                   . Docket No. 4:14-MJ-02004-JJV
 5   PLAINTIFF,                    .
                                   . Little Rock, Arkansas
 6   VS.                           . May 22, 2014
                                   . 2:52 P.M.
 7   NATHANIEL SMITH,              .
                                   .
 8   DEFENDANT.                    .
      . . . . . . . . . . . . . .  .
 9

10

11                            TRANSCRIPT OF

12                          DETENTION HEARING

13               BEFORE THE HONORABLE JOE J. VOLPE

14                 UNITED STATES MAGISTRATE JUDGE

15

16

17

18   ELECTRONIC COURT RECORDER-OPERATOR:  Ms. Stacy Williams

19

20   Transcription Service:            Robin Warbritton
                                       Post Office Box 262
21                                     Vilonia, AR  72173

22

23

24   PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING.

25   TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.
```

2

1   APPEARANCES:

2   For the Government:      Ms. Kristin Bryant
                             U.S. Attorney's Office - Little Rock
3                            Eastern District of Arkansas
                             Post Office Box 1229
4                            Little Rock, AR  72203-1229

5   For the Defendant:       Ms. Kim Driggers
                             Assistant Federal Public Defender
6                            Federal Public Defenders Office - LR
                             The Victory Building
7                            1401 West Capitol Avenue
                             Suite 490
8                            Little Rock, AR  72201

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                               I N D E X

2                     DIRECT    CROSS    REDIRECT    RECROSS

3   WITNESSES FOR GOVERNMENT:

4   Jennifer Hurd            5       29    50,59,60       53

5   David Bratton          61       64

6   Todd Hurd              72       81

7

8   EXHIBITS:                      IDENTIFIED       RECEIVED

9   Government's Exhibit No. 5         19               19

10  Government's Exhibit No. 4         22               22

11  Government's Exhibit No. 1         89               89

12  Government's Exhibit No. 2         89               89

13  Government's Exhibit No. 3         89               89

14

15

16

17

18

19

20

21

22

23

24

25

4

1                    P R O C E E D I N G S

2        (Call to order of the Court.)

3            THE COURT:  Good afternoon.

4            MS. BRYANT:  Good afternoon, Your Honor.

5            MS. DRIGGERS:  Good afternoon.

6            THE COURT:  We're here on the record in the matter of

7    the *United States of America v. Nathaniel Smith, IV*.  It's

8    case 4:14 -- that is not the right case number -- is that an

9    MJ case?

10           THE CLERK:  Yes.

11           THE COURT:  Okay.  I'm sorry.  This is still on the

12   complaint.  That's right.  4:14-2004.  And he is defendant

13   number 1.

14           For the prosecution, you may proceed.

15           MS. BRYANT:  Your Honor, I call Detective Jennifer

16   Hurd.

17           And, Your Honor, for the record, the criminal history

18   reflected in the Pretrial Services Report, can that be the --

19   what -- the document we rely on for his criminal history?

20           THE COURT:  Let me ask the defense, do you know --

21           MS. DRIGGERS:  I don't have any objection to that,

22   Your Honor.  I believe that there were some changes that were

23   made, but we don't -- we don't have any problem.

24           THE COURT:  All right.  Now, and let me just make

25   sure that -- we'll make the whole report -- you just mentioned

Hurd - Direct                                        5

1   the criminal history, but there's other information about him,

2   as far as mental health history and stuff like that, make the

3   whole report a part of the record?

4           MS. BRYANT:  Yes, Your Honor.

5           THE COURT:  All right.  Very good.  It will be

6   received.

7           MS. DRIGGERS:  Thank you, Your Honor.

8           MS. BRYANT:  Detective Hurd.

9       JENNIFER HURD, GOVERNMENT'S WITNESS, SWORN.

10                      DIRECT EXAMINATION

11  BY MS. BRYANT:

12  Q   Good afternoon.  Can you please introduce yourself to the

13  Court?

14  A   Jennifer Hurd.

15  Q   And how are you employed?

16  A   I'm a detective with the Little Rock Police Department.

17  Q   And how long have you been a detective?

18  A   For 17 years.

19  Q   Okay.  What did you do before that?

20  A   I was a patrol officer.

21  Q   Okay.  For how long?

22  A   Two years.

23  Q   Okay.  Are you assigned to a certain squad with the Little

24  Rock Police Department?

25  A   Yes, I work with the vice detail, who is also part of the

1  Denied Innocence Human Trafficking Task Force.

2  Q   Okay.  And can you briefly describe to the Court the

3  Denied Innocence Task Force?

4  A   Yes.  This is a task force that was established to address

5  trafficking of minors and adults for sexual exploitation

6  through the FBI.

7  Q   Okay.  What are some agencies that are involved in the

8  task force?

9  A   Little Rock, North Little Rock, Conway, the FBI, Hot

10 Springs.  There's quite a few.

11 Q   Okay.  And were you involved in the investigation of the

12 -- of Mr. Smith?

13 A   Yes.

14 Q   Okay.  Can you explain to the Court how that investigation

15 began?

16 A   Yes.  On April 10th, 2014, the vice detail received a

17 CyberTip complaint from the National Center for Missing and

18 Exploited Children in reference to a black female who had been

19 advertised on Backpage.com, who appeared to be underage.  At

20 that time, we looked at Backpage and was unable to locate any

21 current ads involving this girl.

22      On April 24th, 2014, Officer Rick Harmon responded to a

23 disturbance at the La Quinta Inn located at 200 South

24 Shackleford in Little Rock.  He made contact with the manager

25 who advised that she had been threatened by Nathaniel Smith,

Hurd - Direct                                              7

1   who was staying at the hotel.  The manager advised that Mr.

2   Smith had rented five rooms and had several girls staying in

3   those rooms.

4           MS. DRIGGERS:  Your Honor, if I could, if we could

5   have the witness testify from her memory, and if she's reading

6   something, we would just ask to see what she's reading.

7           THE COURT:  All right.

8           MS. BRYANT:  That's -- it's a copy of her report.

9   They're welcome to look at it.

10          THE COURT:  All right.

11  BY MS. BRYANT:

12  Q    Okay.

13  A    The manager -- the manager advised that they had been a

14  disturbance and there was a strong odor of marijuana coming

15  from the rooms and that they had asked them to leave.  She

16  told them that she would refund the money.  And the manager

17  stated that Mr. Smith told her that he was going to have

18  someone come to the hotel and hurt her.

19       Officers went to Mr. Smith's room, 206, and could smell a

20  strong odor of marijuana coming from the room.  They conducted

21  a warrant check on Mr. Smith and he was found to have a

22  failure to appear warrant.  He was arrested and transported to

23  the Pulaski County jail.

24  Q    Okay.  Did the officer make contact with any -- any

25  females staying in those rooms rented?

1  A    Yes, they did.

2  Q    Okay.  How many females?

3  A    There were five.

4  Q    Okay.  Did they make any statements?

5  A    Yes, they denied knowing Mr. Smith prior to this date and

6  stated that he had just rented the rooms under his name for

7  the rewards points.

8  Q    Okay.  And were two of these girls Jane Doe and Jane Doe 2

9  that were -- Jane Doe 1 and Jane Doe 2 that were listed in the

10  criminal complaint affidavit?

11  A    Yes.

12  Q    Okay.  What happened next in the investigation?

13  A    On the 27th of April, 2014, I received information from a

14  reliable confidential informant, who advised that Nathaniel

15  Smith was trafficking several girls out of the Atria Inn

16  located on University.  The informant advised that Mr. Smith

17  had one white female and three black females in rooms 205,

18  206, 209, and 212.  The informant stated that there was a

19  mixed Puerto Rican female who had a baby, who wanted help

20  getting away from Mr. Smith.  The informant stated that she

21  was afraid of him, that he had taken all of her money, and

22  taken her car keys, and threatened to have other girls beat

23  her up if she didn't comply with his demands.

24  Q    Okay.  Did the confidential source tell you anything about

25  these girls being advertised?

1  A    Yes, she stated that they had been advertised on

2  Backpage.com.

3  Q    Okay.  And did they give you a name of one of the girls in

4  the ads?

5  A    Yes.  Patrece.

6  Q    And were you able to locate that ad?

7  A    Yes, we were.

8  Q    And did the ad corroborate the information given to you by

9  the confidential source?

10  A    Yes.

11  Q    Okay.  What did you do next?

12  A    We found this ad.  Detective Bratton was working in an

13  undercover capacity and he arranged a date with this

14  individual.  And prior to that, he went to the Atria Inn and

15  got a room roster list.  And rooms 205 and 206 were rented in

16  a female's name involved in the investigation.  Rooms 209 and

17  213 were rented in Nathaniel Smith's name.

18  Q    Okay.  And so, I know you talked about Detective Bratton

19  answering an ad.  Did he answer an ad for Patrece or for a

20  different girl?

21  A    He answered the ad for Jane Doe 1.

22  Q    Okay.  And so, he arranged a date with Jane Doe 1?

23  A    Yes.

24  Q    Okay.  And what happened?

25  A    He responded to the Atria Inn.  She directed him to room

1  206.  He entered the room.  Jane Doe 1 agreed to engage in

2  oral sex for 60 dollars.  Vice detectives were monitoring the

3  operation via a recording device and he gave the signal for

4  officers to come in and make the arrest.  We went in and made

5  contact.  I made contact with Jane Doe 1, who was crying and

6  shaking.  She initially didn't want to talk to us.  She stated

7  that she was afraid.  When I asked her if she was afraid of

8  someone, she stated "beyond afraid."

9  Q    Okay.

10 A    She stated that she was afraid to talk to us because she

11 -- everyone would know that she was a snitch.

12 Q    Okay.  Did you eventually take Jane Doe 1 to the detective

13 division for questioning?

14 A    Yes, I did.

15 Q    Now, while this was going on, were other officers there?

16 A    Yes.

17 Q    And did they observe Mr. Smith?

18 A    Yes, they did.

19 Q    Okay.  Can you explain to the Court what they observed?

20 A    Yes.  Detective Johnson observed Mr. Smith on the second

21 floor of the hotel.  As he approached Mr. Smith, he identified

22 himself as a police officer.  Mr. Smith ran from Detective

23 Johnson into room 209 and slammed the door.  Detective Johnson

24 watched the door until additional officers could arrive, which

25 was approximately ten to 15 minutes.  Detective Johnson then

1  knocked on the door, called out for Mr. Smith.  Mr. Smith then

2  answered the door and Detective Johnson took him into custody.

3  Q    Okay.  I know we've talked about several rooms that had

4  been rented.  Was contact made with anyone else from the

5  rooms?

6  A    Yes.  A white female, who is Jane Doe 2, came out of room

7  205, who was identified -- later identified.  At that time, I

8  had contact with the confidential informant and she advised

9  that Jane Doe 1 and Jane Doe 2 were involved in Mr. Smith's

10  operation.

11  Q    Okay.  And was Jane Doe 2 eventually taken to the

12  detective division for questioning?

13  A    Yes, she was.

14  Q    Okay.  While there, did anyone else come to the scene?

15  A    Yes.  Nathaniel Smith's sister, Natalie Smith, came to the

16  scene, as well as Marjorie Lee.

17  Q    Okay.  And were you advised of who Marjorie Lee was?

18  A    Yes.  Again, the informant advised me that that was

19  Nathaniel Smith's bottom girl or main girl that works for him.

20  Q    Okay.  So she was also prostituting for him?

21  A    Yes.

22  Q    And does she go by a nickname?

23  A    Yes.  MarMar.

24  Q    Okay.  When you came into contact with Ms. Lee, did you

25  notice anything on her face?

Hurd - Direct                                              12

1  A    Yes, she had a laceration on the right side of her face,

2  just under her eye.

3  Q    Okay.  Did she tell you how she obtained that laceration?

4  A    She stated that she had gotten in a fight at her job at

5  the Paper Moon strip club.

6  Q    Okay.  The other individuals you talked to, did they tell

7  you a different story?

8  A    Yes.  They told me that Nathaniel Smith had beat her up

9  and caused the laceration.

10 Q    Okay.  Now when Mr. Smith's sister was there -- what was

11 her name?

12 A    Natalie Smith.

13 Q    Okay.  Did she go to Mr. Smith's room to retrieve his

14 belongings?

15 A    Yes.

16 Q    Okay.  And who else was there with Mr. Smith's sister and

17 Ms. Lee?

18 A    Ms. Lee's mother and Natalie Smith's mother, Nathaniel

19 Smith's mother.

20 Q    Okay.  Now let's talk about the interviews that you

21 conducted.  You conducted an interview with Jane Doe 1?

22 A    Correct.

23 Q    Okay.  And can you inform the Court about what that

24 interview entailed?

25 A    Yes.  She stated that she met Nathaniel Smith in a hotel

1   room in Orlando, Florida.  She advised that --

2   Q   Is this Jane Doe 1 or Jane Doe 2 that you're talking

3   about?

4   A   Jane -- Jane Doe 1, I believe.

5   Q   Okay.  I think Jane Doe -- Jane Doe 1 was the girl who

6   initially -- that Detective Bratton made contact with when he

7   answered the ad.

8   A   Okay.  I'm sorry.  I was mistaken then.

9   Q   Okay.

10  A   So this is -- this is Jane Doe 2.

11  Q   Okay.  Go ahead about what Jane Doe 2 told you.

12  A   Okay.  She said that she had met him in a hotel room in

13  Orlando, Florida, that she knew him by the name of Traffic.

14  She said he initially seemed like a nice guy.  He recruited

15  her to work for him as a prostitute.  And then they came back

16  to Little Rock where she prostituted for him, as well.

17  Q   Okay.  Did she say when they came from Florida to Little

18  Rock?

19  A   She said it was January or early February 2014.

20  Q   And did say the purpose of that trip was for her to come

21  here and prostitute?

22  A   Yes.

23  Q   Okay.  What did -- what are some things that Jane Doe 2

24  told you about quotas that she had to make for Mr. Smith?

25  A   She stated that they had a quota of 500 dollars a day that

1  they had to make.

2  Q    And what happened if they didn't make that quota?

3  A    She stated that he would yell at them, telling them to get

4  their numbers up, stop blowing off dates, and call them out of

5  pocket hoes and tell them that needed to get in pocket.

6  Q    Okay.  What did she state about -- did she talk to you

7  about forms of punishment that Mr. Smith placed on them if

8  they, I guess, some terms, misbehaved?

9  A    Yes.

10  Q    Okay.  Can you explain to the Court what some of those

11  terms were?

12  A    Yes.  They were only allowed to have one meal a day, and

13  that was when he chose to have -- have something to eat.  They

14  weren't allowed to sleep for regular periods.  They -- it was

15  all about making the money, so they weren't allowed to sleep.

16  He continually posted them time and time again.  And if -- if

17  there was a punishment involved, they explained of having very

18  painful sex, where he would hold them down with their knees up

19  around their heads and have sex with them until they cried,

20  until they begged for him to stop, and wouldn't stop when they

21  -- they begged him to.

22  Q    Okay.  What about did he ever threaten them?

23  A    Yes.

24  Q    Okay.  When you talked to Jane Doe 1 and Jane Doe 2, did

25  they both use a similar phrase that Mr. Smith would tell them?

Hurd - Direct                                    15

1  A    Yes.  They stated that he would use the phrase "I will

2  take everything that makes you human from you" and then he

3  would say "your life."

4  Q    Okay.  In your opinion and based on the things that Jane

5  Doe 2 told you, was she scared of Mr. Smith?

6  A    Yes.

7  Q    Did Mr. Smith take Jane Doe 2 anywhere else, other than

8  from Florida to Little Rock?

9  A    Yes.  They went to California.

10 Q    Okay.  Was that for the purpose of prostituting?

11 A    Yes.

12 Q    What did Jane Doe 2 tell you about if Mr. Smith provided

13 her with narcotics?

14 A    Yes.  She said that he provided her with crack cocaine on

15 a regular basis, as much as she wanted, as long as she was

16 working.  She said he -- he would provide her throughout the

17 day.

18 Q    Okay.  Did Jane Doe 2 tell you if she ever saw Mr. Smith

19 with guns?

20 A    Yes, she did.

21 Q    What did she say about it?

22 A    She said that he always had a gun with him and would

23 either hide it in his waistband or he would cut a slit in the

24 mattress of the room that he was staying in and hide it in the

25 mattress.

1  Q   Okay.  What about would Mr. Smith drive her around

2  anywhere in Little Rock and point out things?

3  A   Yes.  She stated that he drove her through his

4  neighborhood where he grew up, showed her -- pointed out

5  houses that had bullet holes in them, and explained that this

6  is how he grew up, and that that's what made him who he was,

7  and that sort of thing.

8  Q   And what did Ms. Smith [sic] tell you was the reason she

9  believed he did that?

10  A   To intimidate her, to make her scared.

11  Q   Let's talk about your interview with Jane Doe 1.  What did

12  she tell you?

13  A   She stated that she also knew Nathaniel Smith as Traffic

14  and that they met through Marjorie Lee.  She stated that she

15  was having a hard time financially when she ran into Marjorie

16  Lee and she recruited her to work for Mr. Smith through

17  prostitution.

18  Q   Okay.  Did she know him by any nickname?

19  A   As Traffic.

20  Q   Okay.  So she was prostituting for Mr. Smith, as well?

21  A   Yes.

22  Q   How would they advertise her?

23  A   On Backpage.com.

24  Q   Okay.  And who would post her Backpage ads, would she or

25  would other -- would Mr. Smith?

1   A    Mr. Smith would.

2   Q    Okay.  Did Jane Doe 1 say any time that Mr. Smith had been

3   physical with her?

4   A    Yes.  She described a time when she was coming back to a

5   hotel room from a date and she went into the room and the

6   lights were off and Mr. Smith had been hiding in the closet

7   and jumped out at her and scared her or startled her.  And she

8   stated that she called him a bitch.  And she stated that he

9   immediately backhanded her and told her that she needed to

10  learn what she could and couldn't say to him.

11  Q    Okay.  What did she do after this?

12  A    She said that she waited until she felt safe, when he was

13  -- he was gone, so she could leave.

14  Q    Okay.

15  A    She called her grandparents to leave.

16  Q    And what happened after she left?

17  A    She said that she received numerous phone calls and texts

18  from Mr. Smith and Marjorie Lee asking her to come back, that

19  he didn't mean to do what he did, and that -- that -- promised

20  it would never happen again.

21  Q    Okay.  Did he say who he was sending to pick her up?

22  A    Yes.  He said that he would -- he would send Marjorie Lee

23  to come pick her up and if she didn't come back with -- with

24  her, that he would come get her.

25  Q    Okay.  And did Jane Doe 1 corroborate what -- essentially

Hurd - Direct                                          18

1   what Jane Doe 2 had told you about the forms of punishment?

2   A    Yes.

3   Q    And about the quota that had to be met?

4   A    Yes.

5   Q    And have you talked to other individuals who worked for

6   Mr. Smith that have said the same information about the

7   quotas?

8   A    Yes.

9   Q    Which was what?

10  A    500 dollars.

11  Q    And did Jane Doe 2 say if Mr. Smith provided her with any

12  narcotics?

13  A    Yes.

14  Q    What did he provide her with?

15  A    Marijuana.

16  Q    Okay.  And did you also take Mr. Smith back to the

17  detective division?

18  A    Yes, we did.

19  Q    And can you explain to the Court his demeanor during your

20  time, I guess, when you were interviewing other individuals in

21  the case?

22  A    Yes.  He was very loud and belligerent, yelling, yelling

23  out to the girls, telling them that this was just misdemeanor

24  charges, and that if they kept their mouths shut, nothing

25  would happen.

1   Q   Okay.  And did there come a time where you started

2   recording how Mr. Smith was acting?

3   A   Yes.

4   Q   Why did you do that?

5   A   To document his -- the way he was acting.

6   Q   Okay.  And did you provide that audio recording to me?

7   A   I did.

8            MS. BRYANT:  And, Your Honor, at this time, I'd like

9   to play the audio recording.

10           THE COURT:  Have you heard it?

11           MS. BRYANT:  And I've provided a copy to defense --

12   or they listened to it.

13           MS. DRIGGERS:  No objection.  We've listened to it.

14           THE COURT:  You have no objection.  Okay.

15           MS. BRYANT:  And this will be Government's Exhibit

16   No. 5.

17           THE COURT:  All right.

18       (Government's Exhibit No. 5 identified and received.)

19       (Begin audio playback, Government's Exhibit No. 5.)

20   BY MS. BRYANT:

21   Q   Is that Mr. Smith we can hear?

22   A   Yes, it is.

23       (Continue audio playback, Government's Exhibit No. 5.)

24   BY MS. BRYANT:

25   Q   Who is he talking to?

Hurd - Direct                                      20

1   A    To me.

2        (Continue audio playback, Government's Exhibit No. 5.)

3   BY MS. BRYANT:

4   Q    Who is MarMar?

5   A    Marjorie Lee.

6        (Continue audio playback, Government's Exhibit No. 5.)

7   BY MS. BRYANT:

8   Q    And your recorder is outside of the room, correct?

9   A    Yes, it is.

10       (Continue audio playback, Government's Exhibit No. 5.)

11  BY MS. BRYANT:

12  Q    How did you perceive that statement?

13  A    As a threat.

14       (Continue audio playback, Government's Exhibit No. 5.)

15  BY MS. BRYANT:

16  Q    I think that -- I don't know if it came through, did one

17  of the detectives with you ask you if that was a threat?

18  A    Yes.

19       (Continue audio playback, Government's Exhibit No. 5.)

20            THE COURT:  Ms. Bryant, may I ask, does it go on much

21  longer?

22            MS. BRYANT:  There is about five more minutes.

23            THE COURT:  All right.

24            MS. BRYANT:  The main part, and I can fast forward to

25  the end, is about the statements he makes when they're

Hurd - Direct                                      21

1   arresting him.

2           THE COURT:  Why don't you do that?  We're kind of in

3   the cumulative phase here, I think.

4           MS. BRYANT:  Yes, sir.

5       (Audio playback, fast forwarded, continue audio playback,

6   Government's Exhibit No. 5.)

7       (End audio playback, Government's Exhibit No. 5.)

8   BY MS. BRYANT:

9   Q   What was Mr. Smith eventually charged with that night?

10  A   Two counts of trafficking of persons and one count of

11  fleeing.

12  Q   And was that on April 29th, 2014?

13  A   Yes.

14  Q   Okay.  Did Mr. Smith eventually bond out on those charges?

15  A   Yes, he did.

16  Q   And did you get the paperwork documenting the bond?

17  A   Yes.

18          MS. BRYANT:  May I approach, Your Honor?

19          THE COURT:  You may.

20  BY MS. BRYANT:

21  Q   I have Exhibit No. -- Government's Exhibit No. 4.  Do you

22  recognize that?

23  A   Yes.

24  Q   And what is it?

25  A   This is the bail bond's paperwork that I got from the

Hurd - Direct                                    22

1    jail.

2          MS. BRYANT:  Your Honor, we'd move to introduce

3    Government's Exhibit No. 4.

4          THE COURT:  Response?

5          MS. DRIGGERS:  I don't know how it's relevant, Your

6    Honor.  I would --

7          THE COURT:  Well, I imagine Ms. Bryant is going to

8    make it relevant, but --

9          MS. BRYANT:  Yes, Your Honor.

10         THE COURT:  All right.  I'll let her make it

11   relevant, and if not, we can take it up at a later time.

12         MS. DRIGGERS:  Okay.

13      (Government's Exhibit No. 4 identified and received.)

14   BY MS. BRYANT:

15   Q    Does it indicate the date that Mr. Smith was bonded out?

16   A    Yes.  It was May 1st.

17   Q    And what was the bond amount?

18   A    100,000 dollars.

19   Q    Okay.  After this arrest, did you subsequently get a

20   criminal complaint and arrest warrant from Judge Volpe?

21   A    Yes, I did.

22   Q    Okay.  And what did you do with this -- with this

23   complaint to try to locate Mr. Smith?

24   A    We conducted an undercover prostitution operation on the

25   ad that -- that we initially were told about, that included

1   the name Patrece.

2   Q    Okay.

3   A    And we performed an operation with that.

4   Q    Okay.

5   A    That ad.

6   Q    So you set up a date with Patrece?

7   A    Yes.

8   Q    And was a date -- did a date go through in the fact that

9   you guys made an arrest?

10  A    Yes.

11  Q    Okay.  And what information did Patrece provide?

12  A    She told us that Nathaniel Smith was staying at Motel 6 on

13  Markham Street.

14  Q    Okay.  Did she state any indication if Mr. Smith had

15  contacted her since he had bonded out?

16  A    Yes.

17  Q    And what did he say to her?

18  A    He told her that he needed her to work for him again, that

19  he was glad that he had run into her, that he needed money,

20  and needed money to get Marjorie Lee out of jail.

21  Q    Okay.  And did she say anything if he had anybody else

22  working for him?

23  A    She did.  She told us about another female that was

24  working for him.

25  Q    Okay.  What did you do with that information?

1  A    We conducted another operation where Detective Bratton

2  posed as an undercover, and made an arrest there, as well.

3  Q    Okay.  And did that individual provide the location of Mr.

4  Smith?

5  A    Yes, she did.

6  Q    Okay.  And was that location the same as where Patrece had

7  said that Mr. Smith would be?

8  A    Yes, it was.

9  Q    Okay.  Was Mr. Smith eventually arrested?

10  A    Yes, he was.

11  Q    Now, had Mr. Smith rented any rooms -- which hotel was

12  this?

13  A    The Motel 6 on Markham.

14  Q    And had he -- had he rented any rooms?

15  A    Yes, he had.

16  Q    Okay.  And where was the girl that was going to conduct

17  the date, what room was she in?

18  A    She was in the room that Nathaniel Smith had rented.

19  Q    Okay.  Now, was Mr. Smith in that room or a different

20  room?

21  A    He was in the room -- a room next door.

22  Q    Okay.  Can you explain how detectives came into contact

23  with Mr. Smith?

24  A    Yes.  Sergeant Hamby was standing outside of the room

25  where the -- the arrest of the female had occurred.  He saw

Hurd - Direct                                         25

1  Nathaniel Smith poke his head outside the door, and then shut

2  the door.  Sergeant Hamby and some other detectives went over

3  to the door, knocked on the door, and announced who they were.

4  And then a Hispanic male opened the door and they ultimately

5  took Mr. Smith into custody.

6  Q    Okay.  And was that room searched that day?

7  A    It was.

8  Q    Was anything found?

9  A    Yes.  There were some items found, debit cards, that sort

10 of thing.

11 Q    Okay.  Was there something that was missed that day?

12 A    Yes, there was.

13 Q    Okay.  Can you explain to the Court what that was?

14 A    It was a handgun.

15 Q    Okay.  Can you explain how law enforcement learned that

16 they had missed the gun?

17 A    The next morning we were notified by the management of the

18 hotel, who said that they were cleaning the room and found the

19 gun that had been stuffed up underneath the night stand, and

20 the only way they had found it was because they had moved the

21 night stand out.

22 Q    Okay.  And did they -- did law enforcement eventually go

23 retrieve that gun?

24 A    Yes, we did.

25 Q    When they made contact with the girl that day, that was

1  arrested in the room by Mr. Smith, did she describe a gun that

2  Mr. Smith would have on him?

3  A    Yes, she did.

4  Q    Okay.  And what was the description of that gun?

5  A    She said it was a black -- the name of the gun is --

6  Q    Is it a Springfield?

7  A    Springfield, yes, Springfield Arms .45.

8  Q    Okay.  And what was the gun that was found in that hotel

9  room; what kind of gun was that?

10 A    It was a Springfield Arms .45, black.

11 Q    Did it match the exact description?

12 A    Yes, it did.

13 Q    Okay.  What about in the room that the girl was in, that

14 she was going to conduct the date, what did you guys find in

15 there?

16 A    There were numerous items found.  Among those were .38

17 rounds.

18 Q    Okay.  And what about -- you had said that you had been

19 given previous information that Mr. Smith would slit a hole in

20 the bed to hide his gun, did you find anything that

21 corroborated that?

22 A    Yes.  Detectives observed a slit in the bed, just as these

23 girls had described.

24 Q    Okay.  Was the firearm found in the room, was it loaded?

25 A    Yes, it was.

1  Q   And did the girl say that she had seen Mr. Smith with the

2  gun that day?

3  A   Yes.  She said she'd seen him at least three times with

4  the gun that day.

5  Q   And the other girls that you talked to, did they all make

6  any statements about if Mr. Smith carried a firearm?

7  A   Yes.  They all stated that they knew he carried one.

8  Q   And where would they say he'd normally keep it on his

9  person?

10 A   In his waistband.

11 Q   I want to talk about -- so Mr. Smith was placed under

12 arrest, where did you transport him then?

13 A   We went to the Northwest substation again.

14 Q   Okay.  Where did you transport him the next morning?

15 A   To federal court.

16 Q   Okay.  How was he acting during his transport to federal

17 court?

18 A   He was complaining again and screaming, complaining about

19 his arm, and he stated that he had been thrown in the shower

20 the night before and fallen and injured his leg and that the

21 jail had not given him any kind of medical care, and that we

22 were denying him medical care, that sort of thing.

23 Q   Okay.  Okay.  Then did you eventually drop him off in

24 Marshals custody?

25 A   Yes, I did.

Hurd - Direct                                            28

1   Q    Did you receive a call back saying you needed to come

2   back?

3   A    Yes.

4   Q    Why?

5   A    I was told that he was complaining of chest pains to his

6   attorney.

7   Q    Okay.  So what happened?

8   A    An ambulance was called and I rode with them, the

9   ambulance, to the med center.

10  Q    Okay.  Did Mr. Smith tell the ambulance that he was having

11  chest pains?

12  A    No.

13  Q    Did the doctors eventually diagnose Mr. Smith with

14  anything?

15  A    Yes.

16  Q    What was it?

17  A    Joint pain.

18  Q    And I think I forgot to ask you earlier, the girls that

19  worked for Mr. Smith, did they have to give him all their

20  money?

21  A    Yes, they did.

22  Q    Okay.  Did they get to keep any of it?

23  A    No.

24       MS. BRYANT:  I think that's all I have right now,

25  Your Honor.

Hurd - Cross                                              29

1          THE COURT:  Cross?

2          MS. DRIGGERS:  Can I just have five minutes to look

3    at her report?

4          THE COURT:  You may.  Do you want me to take a

5    recess?

6          MS. DRIGGERS:  That would be great.

7          THE COURT:  All right.  We'll be in recess.

8       (Recess.)

9                         AFTER RECESS

10         THE COURT:  Ms. Driggers, have you had enough time?

11         MS. DRIGGERS:  Yes, Your Honor.

12         THE COURT:  You may proceed.

13                      CROSS EXAMINATION

14   BY MS. DRIGGERS:

15   Q    Hi, Detective Hurd.

16   A    Hi.

17   Q    I guess we'll just go in the course of events like Ms.

18   Bryant did.

19   A    Okay.

20   Q    Let's talk first about, I guess, the reason we're here,

21   and that's because it's your position that these girls are

22   afraid of Mr. Smith, right?

23   A    Yes.

24   Q    And that your position is he's a danger to the community

25   if he's released, right?

Hurd - Cross                                                    30

1    A    Yes.

2    Q    And you -- you never personally observed him trafficking

3    these girls, right?

4    A    No.

5    Q    Your information that you put in the complaint is based on

6    what these girls have told you?

7    A    Yes, and through our investigation.  Yes.

8    Q    Okay.  So, you would agree with me then that the

9    credibility of these girls is really important to the case?

10   A    Sure.

11   Q    Okay.  So let's talk a little bit about the girls that

12   were at the La Quinta on the 24th of April.  I'm seeing in

13   your complaint that there was a reference to four girls, but

14   did I hear you say there was five girls?

15   A    I may have been mistaken.

16   Q    Okay.

17   A    In my report, I've listed four.

18   Q    And at least two of those girls were then later found at

19   the Atria; am I right about that?

20   A    Yes.

21   Q    Okay.  And when -- when the detectives showed up at the

22   scene at the La Quinta, they were there because the clerk had

23   claimed that Mr. Smith made some threats, right?

24   A    Yes.

25   Q    Was there a police report ever written on a terroristic

1  threatening charge, or assault, anything like that?

2  A    Yes.

3  Q    And what -- who wrote the report?

4  A    I believe that's Officer Harmon.

5  Q    But when Mr. Smith was taken into custody, was he arrested

6  for terroristic threatening?

7  A    No, he was arrested on a warrant for fail to appear.

8  Q    Okay.  So, he was never actually charged with anything for

9  the alleged threats that he made?

10 A    No.

11 Q    Okay.  And so he's in custody.  At what time of night was

12 this at the La Quinta?

13 A    I don't have that report in front of me, so I don't have

14 the time.

15 Q    Well, is it fair to say it was in the evening?

16 A    I honestly don't recall.

17 Q    Okay.  Well, at some point, Mr. Smith is taken down to the

18 jail, booked in on this warrant, right?

19 A    Correct.

20 Q    So, what -- what's going on with the girls at the time

21 that he's in jail?

22 A    It's my understanding that they were made to leave the

23 hotel.

24 Q    Okay.  Did the police follow them or help them get to a

25 place to stay?

1   A   Not that I know of.

2   Q   Would it be fair to say that the police didn't assist them

3   because they didn't see any signs of distress?

4   A   At that time, I don't think it was brought to law

5   enforcement's knowledge that they were working for him.

6   Q   Well, if -- if the girls had appeared in distress, whether

7   it be bruised, beaten, scared, the police would have picked up

8   on that, right?

9   A   I'm -- I would think so, but I wasn't there, so I'm not

10  sure how the circumstances presented themselves at that time.

11  Q   Well, you picked up on it, right?

12  A   Right.  Because I had a complaint.

13  Q   Okay.  But you first, off the bat, when you saw these

14  girls, you suspected that they might have been holding back

15  information, right?

16  A   Correct.

17  Q   So you were able to build rapport and talk to them?

18  A   Yes.

19  Q   So, what I'm saying is, when these officers saw these

20  girls in these hotel rooms at the La Quinta, they didn't see

21  any signs that the girls were in need of help?

22  A   Again, I don't know what they saw.  I do know that that

23  report was forwarded to the vice unit, so I'm assuming,

24  because it was forwarded to us, that they thought that we

25  needed to look into it.

1   Q   Okay.  And is it true that one of the girls there had a

2   baby with her?

3   A   I don't know that.

4   Q   Okay.  I -- there was some reference in the complaint to

5   one of the girls had a baby.

6   A   Yes.  That was at one of the later deals.

7   Q   Is it not true though, that that same girl was at the La

8   Quinta with her baby?

9   A   I don't know if she was -- I know she was there, but I

10  don't know if she had her baby at that time.

11  Q   Okay.  And none of those girls were charged with

12  prostitution at that time, on the 24th?

13  A   No.

14  Q   Okay.  So then, on the 27th, you get a tip from an

15  informant, right?

16  A   Correct.

17  Q   And if I'm understanding you correctly, the informant is

18  telling you something that another girl has told her --

19  A   Correct.

20  Q   -- is that right?  So, let's talk a little bit about the

21  informant's credibility.  What do you know about your

22  informant's credibility?

23  A   I know that she works for other detectives --

24  Q   Does she have --

25  A   -- and that's -- that's how the information came to me.

1  Q    Does she have a history of prostitution?

2  A    I don't know.

3  Q    Does she have a criminal history at all?

4  A    Probably, most informants do.

5  Q    Okay.  And does she have a history of drug use?

6  A    I don't know.

7  Q    So when you say she's a reliable informant then, what are

8  you basing that on?

9  A    Basing that on other detectives who have worked with her

10 in the past.

11 Q    Okay.  Do you know if that informant was on probation or

12 parole?

13 A    I don't know.

14 Q    And the informant never told you that Mr. Smith assaulted

15 her, right?

16 A    No.

17 Q    It's the informant telling you that somebody else told

18 her; am I hearing you right there?

19 A    I don't believe that she told me that the girl had been

20 assaulted, no.

21 Q    Okay.  So then, what was the reason for these girls being

22 fearful of being hurt?

23 A    The information that I received was that this girl was

24 trying to leave him, and that he had taken her money, taken

25 her keys, had threatened her with violence through other

1   girls.

2   Q    And what kind of car was it that she was driving?

3   A    I don't know.

4   Q    Okay.  Did you talk to her about any prior attempts she

5   had made to leave -- well, no, you didn't talk to her at all,

6   right, you're just relying on this informant --

7   A    Correct.

8   Q    -- who is telling you what this other girl said?

9   A    Correct.

10  Q    And you don't know whether the other girl was on drugs or

11  had a criminal record?

12  A    I don't know.

13  Q    Okay.  So then, at some point, the investigation escalates

14  and you all start looking on Backpage for some ads; is that

15  right?

16  A    Correct.

17  Q    And I noted that you weren't able to get the actual ad; is

18  that correct?

19  A    I observed the ad, but due to the time that it was -- that

20  I looked at it, it was late at night, I was not able to

21  capture it or make a copy of it at that time.  The next

22  morning when I went to look at it, to retrieve it, it was no

23  longer there.

24  Q    And so, is that going to be some information that you're

25  able to get later on, or is just gone forever?

1  A    I don't know.  We may be able to get it through Backpage.

2  Q    Okay.  So then, on the 28th, you go on Backpage again and

3  the picture is back up, or, no, is that a different girl?

4  A    No, that's that same ad that I'm talking about.

5  Q    The same ad just popped up again?

6  A    No, that's the date when I was trying to look for it and

7  it was no longer there.

8  Q    Okay.  And the phone number that was associated with that

9  ad, is that the (501) 902 number?

10  A    Correct.

11  Q    And do you know who that phone is subscribed to?

12  A    I do not.

13  Q    So when you -- did you call the number?

14  A    No.

15  Q    Which detective actually called the number?

16  A    Detective Bratton.

17  Q    Okay.

18        MS. DRIGGERS:  So he's going to testify in a minute,

19  right?  Okay.  So I'll ask him those questions.

20        THE WITNESS:  Okay.

21  BY MS. DRIGGERS:

22  Q    So then, on the 29th, you're part of that investigation,

23  right?

24  A    Correct.

25  Q    When you see the girls there in the hotel, is that when

Hurd - Cross                                                                    37

1   they tell you that they're afraid?

2   A    Once we're able to talk with them, yes.

3   Q    But initially, they don't, right?

4   A    Correct.

5   Q    And they don't have bruises on them or they don't appear

6   to be in any kind of pain?

7   A    Not to my knowledge.

8   Q    Are they dressed okay, their hair fixed, nails done?

9   A    I would say no.

10  Q    Okay.  Well, I --

11  A    Not to my -- what I would consider -- I wouldn't consider

12  them clean or fixed or -- I mean, they had the bare minimum of

13  clothing on.

14  Q    Did some of them look like they had been using drugs?

15  A    I mean, I guess that's subjective on what somebody looks

16  like that uses drugs, but --

17  Q    Well, were they shaking, were they -- their eyes red?

18  A    Well, it depends on which one you are asking me about.

19  Q    Well, let's go through each one then.

20  A    Okay.

21  Q    So the first one you talked to was Jane --

22  A    Jane Doe 1.

23  Q    Jane Doe 1.  What did she look like?

24  A    She was crying and shaking and was -- looked fearful.

25  Q    But she's also the one that -- she wasn't crying and

1  shaking until after she had been arrested, right?

2  A    Correct, after we started talking or asking her questions

3  about Nathaniel Smith.

4  Q    So, after you told her we know what's going on, you're

5  under arrest, we need to talk to you about Nathaniel Smith,

6  that's when she starts crying and shaking, right?

7  A    Yes.

8  Q    But before that, there doesn't seem to be a problem,

9  right?

10 A    I mean, you're talking about seconds, maybe a minute of

11 time, so.

12 Q    Okay.  Well, would it be fair to say that these -- are the

13 girls all lined up in one row, are they separated?

14 A    No, they're -- when I came in contact with Jane Doe 1, she

15 was in one room.

16 Q    Okay.  And you describe her as -- would it be fair to say

17 she looked vulnerable?

18 A    Yeah.

19 Q    Does she --

20 A    She looks young.

21 Q    She -- young.  What about desperate?

22 A    I don't know.  I don't know how to answer that.  I don't

23 know what desperate really looks like.

24 Q    Well, did she look like she needed help?

25 A    In my opinion, yes.

1  Q   Okay.  So you talked to her a little bit.  And in the

2  complaint, you mentioned that you talked to her before you

3  turned the recorder on to build rapport; is that right?

4  A   Yes.

5  Q   So, what does that -- what do you say to somebody when

6  you're trying to build rapport?

7  A   I'm trying to assure them that they're in a safe place and

8  that what they're telling me will not be shared with everyone

9  else, and -- unless it goes through a judicial proceeding, you

10 know, of course I'd have to disclose it then.  But I'm just

11 trying to make them feel secure.

12 Q   So what did you tell her, in particular?

13 A   I don't recall.  I mean, it's a process, so there's lots

14 of things that --

15 Q   Okay.  So then, the next one there that night is Jane Doe

16 2?

17 A   2.

18 Q   And what did she look like?

19 A   Similar to Jane Doe 1, disheveled, not -- not very clean.

20 Q   Do you have to build rapport with her, too?

21 A   Yes.

22 Q   And you don't question -- or you're talking to them there

23 at the hotel and it's not being recorded, right?

24 A   No.  No, this is -- I'm talking about -- that's later, at

25 the substation, when I'm talking to them.

1  Q   Okay.  So, you're not talking to them at all there at the

2  hotel?

3  A   In greater detail is when -- when I'm trying to do an

4  interview is at the substation.

5  Q   Okay.  Did you advise Jane Doe 2 that she was under

6  arrest, as well?

7  A   I did not, because I didn't -- I didn't make contact with

8  her until we were at the substation, other detectives made

9  contact with her.

10 Q   Is there anybody else that you -- you, personally, advised

11 they were under arrest that night?

12 A   No.

13 Q   Okay.

14 A   Well, except for Mr. Smith.

15 Q   Mr. Smith.  So then, later on, at the substation, Jane Doe

16 3 and 2 advised that Mr. Smith had recruited them; is that

17 right?  Do I have the Jane Does right?

18         THE WITNESS:  Do we have a 3?

19         MS. BRYANT:  I think in the complaint we had --

20         MS. DRIGGERS:  In the complaint.

21         MS. BRYANT:  -- a Jane Doe 3.  That Jane Doe 3 is

22 Marjorie Lee.

23         THE WITNESS:  Okay.

24         MS. DRIGGERS:  Okay.

25 BY MS. DRIGGERS:

Hurd - Cross                                                41

1  Q   So, one of these girls was from Florida; is that right?

2  A   Correct.

3  Q   Did she tell you what she was doing for a living in

4  Florida?

5  A   I believe she was prostituting there.

6  Q   So she had a history of prostitution before she ever met

7  Mr. Smith?

8  A   I believe so.

9  Q   Did you run her criminal record?

10  A   I believe it was run that night, yes.

11  Q   And does she have a history of loitering, prostitution,

12  drug use, anything like that?

13  A   I don't recall those.  She may have, but I don't recall

14  those.

15  Q   And what did she say about how it is that they got from

16  Florida to Arkansas?

17  A   I believe they drove.

18  Q   Was she forced to come here?

19  A   No.

20  Q   So she wasn't afraid of him then?

21  A   I don't -- I don't know.  She -- she agreed to work for

22  him, she was recruited, and through that process, she -- he

23  believed it would be better if they worked in Little Rock.

24  And I believe that Marjorie was with them.  She got arrested

25  in Florida.  And therefore, they felt like they needed to

1   leave Florida.

2   Q   Marjorie was arrested in Florida?

3   A   Yes.

4   Q   Okay.  For what?

5   A   I believe it was prostitution.

6   Q   And she's a dancer, right?  Isn't she the one that works

7   at the Paper Moon?

8   A   She said she did.

9   Q   Have you tried to verify that with Paper Moon?

10  A   Not yet.

11  Q   Okay.  So it could be true that she works at Paper Moon?

12  A   I don't believe she currently works there.

13  Q   Okay.  Well, she's in jail now, right?

14  A   Right.

15  Q   Did this girl from Florida, did she ever say that Mr.

16  Smith had hit her or hurt her?

17  A   No.

18  Q   Okay.  And Marjorie either?

19  A   No.

20  Q   Because Marjorie says that the cut on her eye was from

21  work, right?

22  A   Correct.

23  Q   And she sought medical treatment for that, right?

24  A   Yes.

25  Q   So, after this bust, I guess on the 29th, Mr. Smith bonds

1  out on the 1st, right --

2  A   Correct.

3  Q   -- that's what the bond papers showed?  So then, tell me

4  again how it is that he was arrested?  So what happens between

5  the 1st of May and the 15th?

6  A   We did a complaint.

7  Q   Uh-huh.

8  A   And we checked Backpage on a daily basis looking for

9  various ads.  We saw the pictures on Backpage of the original

10 girl that we had received the complaint about, Patrece.

11 Q   The one that looked underage?

12 A   No.

13 Q   Okay.

14 A   The one where it was taken down, where I was trying --

15 Q   Okay.  Patrece?

16 A   Yes, Patrece.  And therefore, we made a -- organized an

17 operation around that, where Detective Bratton made a date

18 with her.

19 Q   So, when -- when these pictures are getting posted, who is

20 posting the pictures?

21 A   In these particular situations, we were told that Marjorie

22 Lee and Nathaniel Smith were posting the ads.

23 Q   So when Mr. Smith is in jail, and ads pop up, that's

24 Marjorie that's posting them?

25 A   No.  In that particular instance, Patrece told us that she

1  had posted the ad.

2  Q   So, Patrece knows how to use the phone, knows how to use

3  Backpage, and she can post the ads on her own?

4  A   I believe she was taught by Marjorie.

5  Q   Okay.  So, if Mr. Smith is in jail, who is she giving her

6  money to for her --

7  A   She's work -- she stated she was working for herself.

8  Q   Okay.  Did she tell you that she had worked for herself

9  before?

10 A   Yes.

11 Q   So, this wasn't her first time knowing how to -- to make

12 these dates?

13 A   No, I'm sorry -- I'm sorry -- I'm thinking of another

14 girl.  No, she -- Patrece stated that she had not prostituted

15 until she met Nathaniel Smith.

16 Q   Okay.  Who is the other girl that had prostituted and can

17 basically hold her own?

18 A   Jane Doe 2.  Sorry.

19 Q   Well, and we know that the girl from Florida can do it on

20 her own, too, right, because she's -- she was apparently doing

21 that in Florida before she met Mr. Smith?

22 A   That's Jane Doe 2.

23 Q   Oh, that is Jane Doe 2?

24 A   That's who I was talking about.  Yes.

25 Q   Okay.  What about Marjorie, she's got a history of that,

Hurd - Cross                                                    45

1    too, right?  You said that in Florida --

2    A    Yes.

3    Q    So, the only one of these girls who say that they haven't

4    been a prostitute before they met Mr. Smith is Patrece?

5    A    And Jane Doe 1.

6    Q    Okay.  So, let's talk about the room at the Motel 6.

7    Patrece tells you that Mr. Smith is there, right?

8    A    Correct.

9    Q    And then what happens?

10   A    She tells us that he has a new girl working for him, that

11   goes by the name of Sonia.  She showed us the ad on Backpage.

12   We, again, organized an operation where Detective Bratton made

13   a date with her.

14   Q    Okay.  So he shows up.  He -- or he's calling, I guess --

15   well, I'll ask him.  He shows up.  And then what happens?

16   A    They do the date, she's placed under arrest, and she's

17   asked if she knows where Nathaniel Smith is, and she tells us

18   where he is.

19   Q    And where is he?

20   A    In a room next door.

21   Q    Was that room reserved under his name?

22   A    Which room, the one she was in or the one --

23   Q    Uh-huh.  Both -- either one of them?

24   A    I believe the one that she was in was reserved in his

25   name.

1  Q   Okay.  What about the room where he was found?

2  A   I believe that was in someone else's name.

3  Q   Did you have a date of when that room had been rented?

4  A   No.

5  Q   Did you get the hotel records?

6  A   We're in the process of trying to gather all those.

7  Q   Okay.  So then, how is -- tell us again how it is that

8  this gun was found.

9  A   Okay.  The day after the arrest of Mr. Smith, the

10 management of the hotel contacted law enforcement and advised

11 that while they were cleaning the room they had found this --

12 this gun.

13 Q   Okay.  But there was more -- more than Mr. Smith had

14 occupied that room, right?

15 A   Yes.

16 Q   And you said there was a Hispanic male?

17 A   Yes.

18 Q   Did you talk to him about anything?

19 A   I did not.  I was not at that scene.  Other detectives

20 told me that there was a Hispanic male there.

21 Q   Okay.  So if any of those people had been interviewed,

22 there will be a police report about it?

23 A   Correct.

24 Q   And if there's not a police report about it, it's fair to

25 say nobody else was asked?

Hurd - Cross                                                     47

1  A    I don't know.  I mean, the gun was found the next day, so

2  the detectives wouldn't have known to ask.

3  Q    Okay.  Well, if there had been other -- if there's other

4  people in the room, what it sounds like to me is that nobody

5  asked any of those other people in the room whether that gun

6  belonged to them?

7  A    They didn't know the gun was there.

8  Q    But when they did know the gun was there, when they found

9  out, they didn't go to the hotel clerk and get the name and

10 phone number of the other people who had been in the room?

11 A    Yes, they -- they talked with the person that had rented

12 the room.  The other people were just -- have scattered to the

13 wind.

14 Q    Okay.

15 A    I mean, they're --

16 Q    So there just wasn't a way to talk to them?

17 A    Right.

18 Q    Okay.  Were any pictures taken of this gun and its

19 position in the room?  No?

20 A    I don't believe so.  I'm not -- I'm not sure, but I don't

21 believe so.

22 Q    What about this slit in the bed, any pictures taken of

23 that?

24 A    No.

25 Q    And you say that's -- the girls had told you that's where

Hurd - Cross                                                    48

1    he --

2    A    Yes.

3    Q    -- keeps the gun?  Was there anything found in the

4    mattress?

5    A    No.

6    Q    And what kind of shells were they that were found?

7    A    .38.

8    Q    And what was the gun?

9    A    The gun was a .45.

10   Q    Okay.  I know we heard Mr. Smith on the recording a minute

11   ago, how long had he been in the interview room before you

12   turned that recording on?

13   A    Without looking back at my notes, I -- I can give you just

14   an estimated, I would -- probably an hour and a half, maybe

15   two hours.  I was conducting the other interviews.

16   Q    Okay.  So, but had he been in there before you interviewed

17   him?

18   A    He was there while I was interviewing the other ones, so,

19   yes.

20   Q    Okay.  Was he drug tested that night?

21   A    No.

22   Q    Was anybody aware of his previous history of mental health

23   issues?

24   A    No.

25   Q    So you didn't know that he's been diagnosed before with

Hurd - Cross                                          49

1   paranoia?

2   A    No.

3   Q    And at what point is it that you went over his Miranda

4   rights?

5   A    When I went into the room to question him.

6   Q    So, he's in the room, that's when you question him, but

7   then you leave and he's in the room for two more hours?

8   A    No.

9   Q    No?

10  A    No.  He was in the room while I was questioning the other

11  witnesses in the case.  That was the two hour time period that

12  I'm talking about.

13  Q    Okay.

14  A    When I was through interviewing all the other people is

15  when I went to -- to talk with him.

16  Q    So that's why we don't have it on the recording, because

17  you told him before?

18  A    Told him?  I'm sorry, I'm not following.

19  Q    Sorry.  You told him about his rights before --

20  A    Yes.

21  Q    -- you turned the recorder on?

22  A    Correct.

23  Q    Okay.  That's what I'm trying to figure out, if it was

24  before or after the recording?

25  A    Yes, it was before the recording.

1  Q   Okay.  And he's not hollering out at anybody there but --

2  but MarMar, right?

3  A   At that time, yes.

4         MS. DRIGGERS:  Okay.  I think that's all my

5  questions.  Thank you.

6         THE COURT:  Redirect?

7                     REDIRECT EXAMINATION

8  BY MS. BRYANT:

9  Q   Can you just explain again the circumstances surrounding

10 your -- this recording that we played, why did you record it?

11 A   I recorded it to document his behavior and his attitude

12 during that time period and how he was calling out to the

13 girls, and telling them not to talk, and that these were just

14 misdemeanor charges, and that sort of thing.

15 Q   Okay.  And I want to make sure, the ammunition was found

16 in the room with Mr. Smith -- rented under Mr. Smith's name,

17 correct?

18 A   Correct.

19 Q   And then the other room was the gun that was loaded?

20 A   Correct.

21 Q   Okay.  Talk about that, Mr. Smith rented rooms, correct?

22 A   Yes, he did.

23 Q   So, the girls told you things about Mr. Smith, but you

24 also have other corroborating evidence?

25 A   That is correct.

1  Q   Okay.  When you talked to the girls, did you talk to them

2  separately?

3  A   Yes, I did.

4  Q   And was what they told you, their testimony, essentially

5  the same?

6  A   Yes.

7  Q   About their working with Mr. Smith?

8  A   Yes.

9  Q   I want to talk about was Mr. Smith there 24/7 with the

10  girls?

11  A   I don't believe so.

12  Q   Okay.  Did they tell you what would happen if Mr. Smith

13  were to leave?

14  A   Yes.

15  Q   What did they say?

16  A   That Marjorie Lee would be in charge.

17  Q   Okay.

18  A   And would handle things and report back to him if they

19  were out of line or had done something they shouldn't have

20  done.

21  Q   Okay.  I want to talk about how long have you been working

22  in human trafficking?

23  A   Approximately three years.

24  Q   Okay.  Have you done training in human trafficking and

25  everything?

1   A   Yes, I have.

2   Q   In your experience, when you first meet victims of human

3   trafficking, what do they usually tell you at the beginning?

4   A   They usually don't want to talk to me.

5   Q   Okay.  Does it usually take a while for them to trust you?

6   A   It does.

7   Q   In your experience, do they usually try to protect the

8   person that they're working for?

9   A   Yes.

10  Q   And in this instance -- I think Ms. Driggers had asked you

11  a question about what made you believe that these girls were

12  scared -- after talking with them, why do believe that they

13  were scared of Mr. Smith?

14  A   Because of the way they described his demeanor, his

15  mannerisms, that he was very intimidating, the things that he

16  told them about his background, his past history, that he --

17  they had witnessed or either had been told about him hitting

18  on Marjorie, that they had either heard it through the walls,

19  that sort of thing.

20  Q   Okay.  What would they say about -- when they observed him

21  treat Marjorie that way, were they scared that that's how they

22  were going to be treated if they didn't --

23  A   Yes.

24  Q   And is that why they told you they believed that he beat

25  up on Marjorie?

1   A    Yes.

2          MS. BRYANT:  Okay.  I think that's all I have, Your

3   Honor.

4                      RECROSS EXAMINATION

5   BY MS. DRIGGERS:

6   Q    Detective Hurd, do you have any evidence that these girls

7   have been -- or that anybody has posted ads on Backpage about

8   these girls since Mr. Smith and Marjorie have been

9   incarcerated?

10  A    There -- yes, the ad has been posted on Patrece, the one

11  that we made that arrest on.

12  Q    Okay.  Are you all continuing to monitor Backpage or any

13  of the other sites to see if these girls are advertising

14  themselves?

15  A    Yes.

16  Q    Okay.  And, to date, have you found any other evidence?

17  A    No.

18  Q    Okay.  Thank you.

19         THE COURT:  Follow up?

20         MS. BRYANT:  No, Your Honor.

21         THE COURT:  Detective, the address, 2307 South

22  Harrison, whose is that, what's the --

23         THE WITNESS:  It's my understanding that it's a

24  relative of Mr. Smith.  I'm not sure if it's his mother or his

25  father.

1          THE COURT:  Do you know, does he reside there?

2          THE WITNESS:  That is the address he gave to be where

3  he lived, but I'm not sure.

4          THE COURT:  All right.  And then tell me about the

5  Springfield .45 caliber, you were -- or police were notified

6  beforehand of the fact that he had this firearm, or was it

7  after the fact?  And when I say beforehand, being before you

8  found it, or was it after you had found it that you later went

9  and found out from the witnesses that he carried such a

10 similar type of weapon?

11         THE WITNESS:  No, they told us before that, that he

12 had carried a weapon.

13         THE COURT:  When did you -- when were you notified of

14 that, about when, in relation to --

15         THE WITNESS:  That was on the April 29th, when we

16 made the first contact with Jane Doe 1 and 2.

17         THE COURT:  Okay.  And Jane Doe 1 specifically

18 identified it as a Springfield .45 caliber?

19         THE WITNESS:  No, she did not.  She just stated that

20 she had seen him with a gun.

21         THE COURT:  She just said a gun?

22         THE WITNESS:  Yes.

23         THE COURT:  Okay.  And then, arrest number one, he's

24 in the room and he won't come out of the room.  How do

25 officers get him out of the room -- this is at La Quinta, how

1    do they ultimately get him out of the room?

2           THE WITNESS:  The arrest where he -- the warrant

3    arrest, is that --

4           THE COURT:  First arrest.

5           THE WITNESS:  Very first arrest?

6           THE COURT:  La Quinta.

7           THE WITNESS:  Honestly, I'm not sure.  I'm not sure

8    if it's listed in the incident report.  But typically, after a

9    few -- time passes, he comes out on his own, that's what he

10   did on the past two arrests.

11          THE COURT:  Okay.  All right.  So, time passed, but

12   during arrest number two, I mean, police knew or had

13   information that he was potentially armed?

14          THE WITNESS:  That -- we learned during that, that

15   investigation, that -- on the 29th, that he had a weapon, but

16   not until we were able to interview the girls down at the

17   substation.

18          THE COURT:  Okay.  So, I'm -- I'm not following you

19   then.  So, on the second arrest, when did you -- when did

20   police know or have information that he carried a firearm?

21          THE WITNESS:  After we interviewed Jane Doe 1 and

22   Jane Doe 2.

23          THE COURT:  Okay.  So, it was after that whole scene

24   at the second -- the Atria hotel?

25          THE WITNESS:  Yes.  Yes.

Hurd - Presiding Official                    56

1      THE COURT:  Okay.  It was after that, that you were

2  notified.  Okay.  All right.  So, police knock on the door,

3  and then after some time though, it seemed like he came out on

4  his own?

5      THE WITNESS:  Yes.

6      THE COURT:  After the Hispanic male opened the door?

7      THE WITNESS:  The Hispanic male was on the third

8  arrest.

9      THE COURT:  Okay.

10      THE WITNESS:  That was at the Motel 6.

11      THE COURT:  Okay.  All right.  Now, I'm like -- I'm

12  obviously losing track of this.  Okay.  Is it me or is it --

13  am I --

14      THE WITNESS:  It's confusing.

15      MS. BRYANT:  It's confusing with the Jane Does and

16  the hotels.

17      THE COURT:  Well, the Jane Does aren't bothering me.

18  Okay.  So, all right, we have the La Quinta, we have the

19  Atria, and we have Motel 6.

20      THE WITNESS:  Correct.

21      THE COURT:  In that order?

22      THE WITNESS:  Correct.

23      THE COURT:  Okay.  In the order of one, two, three,

24  where do you learn about the firearm?

25      THE WITNESS:  After the interviews from the Atria.

1            THE COURT:  That's two?

2            THE WITNESS:  Yes.

3            THE COURT:  Okay.  So, number three is you know about

4    the firearm?

5            THE WITNESS:  Correct.

6            THE COURT:  All right.  And that's where the firearm

7    is discovered?

8            THE WITNESS:  Correct.

9            THE COURT:  Okay.  So, what I'm getting at is, when

10   police knock on the door and they know that Mr. Smith is in

11   that room, and that's where the Hispanic male is, as well?

12           THE WITNESS:  Yes.

13           THE COURT:  Police know there is a firearm

14   potentially involved in this, that Mr. Smith potentially

15   carries a firearm?

16           THE WITNESS:  Correct.

17           THE COURT:  And so, I just want to know what -- what

18   went down?  It seems to me that it would be a bigger deal to

19   knock on the door, Mr. Smith is not opening the door, and

20   there's information that Mr. Smith may be armed.  That's my

21   whole question.  And I don't know that I really understood.

22   It seems like it's just kind of a knock on the door, hey, man,

23   come out, and then the Hispanic male opens the door.  Doesn't

24   seem to me, that my experience is, with Little Rock Police

25   Department, that it would be so casual.  And I just kind of

1   want to know -- and maybe you don't know.

2           THE WITNESS:  I was not at that scene, so I'm not

3   certain on how that all went down.  What I was told was that

4   Sergeant Hamby saw him stick his head out the door.  Shuts the

5   door.  Sergeant Hamby goes over to the door, knocks.  He calls

6   for other detectives to come in to assist that were there on

7   the scene, as well, that were in the parking lot.  And they

8   knock again, and then the Hispanic male comes to the door,

9   opens the door, and they find Mr. Smith in the bathroom.

10          THE COURT:  Okay.  So, Mr. Smith is in the bathroom.

11  Okay.  I just -- I mean, I don't know, I'd like to hear more

12  about what happened there, because I think it's important for

13  my determination, but I don't know that this witness really

14  knows the details on where I want to know.

15          And then, Detective Hamby would have known about the

16  firearm though, correct?

17          THE WITNESS:  Correct.

18          THE COURT:  Okay.  And then, that was -- again, what

19  I want to make clear in my mind, is you know at arrest number

20  two, Atria, that's when the information is revealed that there

21  is this firearm; don't know what kind of firearm, but witness

22  says he carries a firearm?

23          THE WITNESS:  Correct.

24          THE COURT:  Then Motel 6 arrest goes down.  All

25  right.  And then, the day after arrest number three, Motel 6,

1  is when that firearm is later discovered in the hotel room?

2           THE WITNESS:  Correct.

3           THE COURT:  Okay.  All right.  That's what I needed

4  to know.

5           Do you all have any follow up questions based on my

6  questions?

7           MS. DRIGGERS:  No.

8                      REDIRECT EXAMINATION

9  BY MS. BRYANT:

10 Q   Just to clear up, the firearm that was found after the

11 third arrest was the Springfield gun.  Where, in that scheme

12 of things happened, did you learn that he had a Springfield

13 gun; when did the girl describe that to you guys?

14 A   During that third arrest.

15 Q   Okay.

16 A   The girl that had posted as Sonia, she told us that --

17 that she had seen him at least three times that day with a

18 Springfield .45.

19 Q   Okay.  And did the hotel tell you guys where the gun was

20 located when they found it?

21 A   Yes.

22 Q   Where was it?

23 A   It was up underneath hidden in the end table.

24           MS. BRYANT:  Okay.  That's all I have.

25           THE COURT:  Okay.  Well, and that is important.  So,

Hurd - Redirect                                          60

1   after arrest number three, a witness tells you specifically

2   about the firearm being a Springfield manufactured .45

3   caliber; she specifically describes it by manufacturer and

4   caliber?

5           THE WITNESS:  Yes.

6           THE COURT:  Okay.  And then, but -- that's -- is that

7   before or after it's in police possession?

8           THE WITNESS:  That is before.

9           THE COURT:  Okay.

10          THE WITNESS:  Because that was the night of the third

11  arrest, and we did not have the weapon until the next day.

12          THE COURT:  Got you.  Okay.  All right.

13                  FURTHER REDIRECT EXAMINATION

14  BY MS. BRYANT:

15  Q   And can you -- can you kind of tell Judge, explain, is

16  Springfield written pretty clearly on the firearm?

17  A   It is, yes.

18  Q   Okay.  So it's something that she could have observed if

19  she saw it on it?

20  A   Yes.

21          MS. BRYANT:  That's all.

22          THE COURT:  All right.  Thank you.  That's why -- I

23  heard you testify that she identified it as a Springfield, but

24  it wasn't until the third arrest.  And my question, I guess,

25  was -- my -- it was bad questioning when I asked you after the

Bratton - Direct                                      61

1    second arrest.  But after the second arrest, you still knew he

2    carried a firearm?

3              THE WITNESS:  Correct.

4              THE COURT:  Okay.  Anything else?

5              MS. BRYANT:  That's all I have.

6              THE COURT:  All right.  You may stand down.  Thank

7    you.

8         (Witness stands down.)

9              THE COURT:  You may call your next witness.

10             MS. BRYANT:  Detective Bratton.

11        DAVID BRATTON, GOVERNMENT'S WITNESS, SWORN.

12                        DIRECT EXAMINATION

13   BY MS. BRYANT:

14   Q   Can you please introduce yourself to the Court?

15   A   I'm sorry, ma'am, I didn't --

16   Q   Can you please introduce yourself to the Court?

17   A   Oh.  I'm David Bratton.

18   Q   And how are you employed?

19   A   I'm a detective with Little Rock Police Department vice

20   detail.

21   Q   Okay.  And how long have you been with LRPD?

22   A   16 and a half years.

23   Q   Okay.  And were you present on the night of April 29th,

24   when Mr. Smith was arrested?

25   A   Yes.

Bratton - Direct                                    62

1    Q   And were you located outside of the interview room when

2    that tape was being played -- or was being recorded?

3    A   Yes.

4    Q   Okay.  And did you document some of the statements that

5    Mr. Smith was making?

6    A   I did document some statements that were made prior to the

7    tape being turned on.

8    Q   Okay.  And can you just tell the Court what some of those

9    statements are?

10   A   Yes.  One of his statements were, and I'm quoting, quote:

11                  "Ladies, nobody talk -- if nobody

12                  talks, this is just misdemeanor

13                  bullshit."

14       Unquote.  Quote:

15                  "Candy, they ain't got nothing."

16       Unquote.  Quote:

17                  "Don't say shit."

18       Unquote.  And he was yelling these off and on.

19   Q   Okay.  And were the other witnesses, were they within

20   earshot of where they could here him?

21   A   Yes.

22   Q   Okay.  Now, were you also present when Mr. Smith was taken

23   to the hospital?

24   A   Yes.

25   Q   And did Mr. Smith -- what was his behavior at the

1  hospital?

2  A    You know, he would sleep off and on and he'd be real

3  docile, and then he'd get real agitated for no apparent

4  reason.

5  Q    Okay.  And did he make some statements then, that day,

6  that you took note of?

7  A    Yes.  He was talking to me and he said, quote:

8                     "Y'all ain't got shit.  Those

9                     girls y'all think y'all got

10                    against me, those girls are long

11                    gone.  Those girls won't say

12                    shit."

13     Unquote.  Quote:

14                    "Those girls ain't gonna show up.

15                    Y'all fucked up on this one."

16     Unquote.  Quote:

17                    "I've got the best lawyer in the

18                    state.  Y'all are gonna pay.  The

19                    only thing I'm guilty of is

20                    renting the rooms for points."

21     Unquote.

22  Q    Okay.  And did there ever come a time when you were trying

23  to take photos of him?

24  A    Yes.

25  Q    And can you describe to the Court when you were trying to

1   take photos of his hospital bracelet?

2   A   Yes.  I was attempting to photograph the arm he was saying

3   was injured.  And he had a name tag on his left arm, you know,

4   the hospital had placed on him.  I reached down and touched

5   the name tag to pull it back to see if there was any injury

6   due to handcuffs, and when I touched that, Mr. Smith began

7   screaming and he -- he was yelling, and very loudly, quote:

8              "Nurse, nurse, he's hurting me.

9              Nurse, he's wrenching my arm.  I

10             demand to speak with the head of

11             the hospital."

12     Unquote.

13          MS. BRYANT:  Okay.  May I have one moment, Your

14   Honor?

15          THE COURT:  You may.

16          MS. BRYANT:  That's all I have.

17          THE COURT:  Cross?

18                    CROSS EXAMINATION

19   BY MS. DRIGGERS:

20   Q   Detective Bratton, right?

21   A   Yes, ma'am.

22   Q   I'm going to ask you some questions about the statements

23   that Mr. Smith gave to you, but first I want to talk about

24   these dates that you arranged with some of the girls.

25   A   Yes, ma'am.

Bratton - Cross                                         65

1   Q    You -- were you the one to personally search online --

2   A    Yes.

3   Q    -- for these girls?

4   A    The Backpage.

5   Q    Okay.

6   A    Yes.

7   Q    And you made the phone calls?

8   A    Yes, ma'am.

9   Q    Who answered the phone?

10  A    What particular day are you talking about?

11  Q    Okay.  Let's talk about the first day.

12  A    Okay.  On the 29th?  April 29th?

13  Q    Yes.  Yes, that's after the La Quinta incident.  Yes, the

14  29th.

15  A    Okay.  Yes.

16  Q    So you place a call to that number and who answers?

17  A    It was a female.

18  Q    Okay.  And what does the female say?

19  A    We made a date to arrive, she gave me the address to

20  arrive at 6100 South University, the Atria hotel.

21  Q    Did she say -- I mean, is she calling all the shots or is

22  she saying I need to run this by my boss or, you know --

23  A    No, on the phone --

24  Q    -- let me call you back?

25  A    -- no, ma'am.  On the phone she's -- just she and I

Bratton - Cross                                    66

1   talking.

2   Q   Okay.  So she didn't have to call you back to confirm,

3   everything was done just like that?

4   A   Yes.

5   Q   Okay.  And then you show up and she's in the room?

6   A   Yes.  She had actually text me the address to the hotel.

7   After our phone conversation, then she text me the address to

8   the hotel.  But, yes.

9   Q   Did you save all those text messages?

10  A   Yes.

11  Q   So you show up and what does she look like?

12          MS. BRYANT:  Judge, I don't really know what the

13  relevance of this is for today's hearing.

14          MS. DRIGGERS:  Well, one of the allegations is that

15  these girls are damaged and hurt, and he's the one that's

16  first on the scene, so I'm just asking what his impression

17  was.

18          THE COURT:  Why don't you narrow it then?  I imagine

19  that the Government is concerned about the safety of the

20  witness and the identification of the witness.  Is that what

21  the objection is?

22          MS. BRYANT:  Yes, Your Honor.  And I think Detective

23  Hurd testified that Jane Doe 1, who we're talking about, did

24  not have any physical injuries on her, and we'll concede that

25  she didn't have any physical injuries.  And I think Detective

1  Hurd described her adequately, at least her demeanor, and that

2  she looked disheveled and --

3            THE COURT:  I'm going to let Ms. Driggers ask the

4  questions and, you know, just -- I'll let the detective

5  describe more of like the emotional or physical outlook,

6  without saying that she was either a white female or -- is

7  that fair enough?  I mean --

8            MS. BRYANT:  Yes, Your Honor.

9            THE COURT:  All right.

10 BY MS. DRIGGERS:

11 Q   So, you don't have to describe her physical appearance.

12 A   Yes, ma'am.

13 Q   I'm not trying to give away her identity.

14 A   Yes, ma'am.

15 Q   But was she scared, was she timid, was she --

16 A   She was -- she was nervous.  She was nervous.  You know,

17 when I entered the room, she was nervous.  More nervous than

18 most girls that I deal with out there.

19 Q   And this is all being recorded, right?

20 A   Audio recorded.

21 Q   Audio.  And she tells you to put the money in the drawer?

22 A   Yes.

23 Q   And then you give a signal?

24 A   Correct.  I give a verbal signal.

25 Q   Okay.  At any point, does she tell you she needs help?

Bratton - Cross                                          68

1   A   Not me, no.  Once I give the signal, the arrest team

2   enters the room, and I get myself together and I leave.  The

3   arrest team handles it from there.

4   Q   Okay.  What about the -- the second time, the second date,

5   this is with the new girl, right?  Do I have that right?

6   A   I'm not sure which -- which --

7   Q   The one at the Motel 6.

8   A   Okay.  That's actually the third one.

9   Q   Okay.  So then who is the second one?

10  A   The second one would have been Patrece.

11  Q   Okay.  Patrece.  Anything stand out to you about her when

12  you met her?

13  A   Our conversation was one hundred percent through text.

14  Once I met her, she was just real busy.  You know, we made the

15  date in person, and then I gave the signal, arrest team came

16  in and I left.

17  Q   So she wasn't as nervous as the other one was?

18  A   I wouldn't say -- no, she was not as nervous as the first

19  girl, no.

20  Q   Okay.  Did she have any signs of bruises or lacerations on

21  her?

22  A   She kept the lights out.  The room was extremely dark.  I

23  could not tell you if she had bruises or not.

24  Q   Okay.  And then the third one, at the Motel 6 --

25  A   Yes.

Bratton - Cross                                          69

1   Q   -- this is with the new girl, Sonia, right?

2   A   Yes.  Sonia.

3   Q   Okay.  And how did you make that date, did you -- you

4   called a number?

5   A   Right.  There was a ad, then we called the number, and I

6   spoke with her and she gave me directions to the -- to the

7   hotel.

8   Q   So, all the times you're making these dates, you're

9   speaking to the girl herself?

10  A   The -- not -- not Patrece.  That was one hundred percent

11  text messages.

12  Q   Okay.  But you don't have to go through somebody else to

13  get to the date, you're speaking to the date directly?

14  A   Oh, when I -- correct -- on Sonia, I spoke directly to

15  Sonia -- or I spoke directly to a female.  When I arrived on

16  scene at the room that the female on the phone gave me, Sonia

17  was there.

18  Q   Okay.  And what about her, did she appear nervous?

19  A   Yes, she was nervous.

20  Q   Did she say anything to you like, help, I need out of

21  here?

22  A   Not at that time.  Not before the deal was made.  Once the

23  deal was made and the arrest team got there, she -- you know,

24  she just seemed real willing to help.

25  Q   Well, sure, she had been arrested at that point, right?

1  A    She had been arrested, yes.

2  Q    Okay.  Okay.  And then with regard to Mr. Smith's

3  statements, you -- you didn't ever drug test him, right?

4  A    No.

5  Q    Do you know if the hospital ran any blood work to show if

6  he was high?

7  A    I have no idea what the hospital did, ma'am.

8  Q    Okay.  And are you aware that he actually does have like

9  -- has had surgery on his arm?

10  A    No, ma'am.  I mean, he -- he verbally told us that.  I --

11  you know, I don't know his medical history.

12  Q    Okay.  And you didn't know his other prior mental history

13  of --

14  A    No, ma'am.

15  Q    -- paranoia?

16  A    No, ma'am.

17  Q    Okay.  Did you call any of his family to find out?

18  A    I did not.

19        MS. DRIGGERS:  Okay.  I don't have any other

20  questions.  Thank you.

21        THE COURT:  Redirect?

22        MS. BRYANT:  No, Your Honor.

23        THE COURT:  Detective, once the signal goes, do you

24  leave leave, or do you actually participate in the arrest or

25  anything like that?

Bratton - Cross                                              71

1          THE WITNESS:  Your Honor, typically, once I give the

2     signal, the arrest team comes to the door.  If they cannot get

3     in the door, I usually open the door, and the -- the uniformed

4     officers, or officers come in with police markings, they take

5     the suspect into custody.  Usually, I don't get involved in

6     that unless I -- unless there is going to be an officer safety

7     issue, then I would.  But up until this point, I have not

8     gotten involved.  The arrest team takes custody of that

9     person.

10         THE COURT:  And were you -- did you witness anything

11    with regard to the arrests of Mr. Smith on any of the three

12    events?

13         THE WITNESS:  No, sir.  No, sir, I didn't see any of

14    his arrests in person.

15         THE COURT:  All right.  Any follow up questions based

16    on my questions?

17         MS. BRYANT:  No, Your Honor.

18         MS. DRIGGERS:  No, Your Honor.

19         THE COURT:  You may stand down, sir.  Thank you.

20         THE WITNESS:  Thank you, Your Honor.

21       (Witness stands down.)

22         THE COURT:  You may call your next witness.

23         MS. BRYANT:  Todd Hurd.  Detective Todd Hurd.  My

24    fault.

25         THE COURT:  He's well known in these community -- or

1   in this community, so we understand.

2        TODD HURD, GOVERNMENT'S WITNESS, SWORN.

3                        DIRECT EXAMINATION

4   BY MS. BRYANT:

5   Q    Good afternoon, Detective.  Can you please introduce

6   yourself to the Court?

7   A    My name is Todd Hurd.  I'm a detective with the Little

8   Rock Police Department's intelligence unit.

9   Q    Okay.  And let's talk about your background in law

10  enforcement.  Where did you start?

11  A    Could we actually start before that?

12  Q    Sure.

13  A    Okay.  Great.  My first experience was with Youth Home,

14  Incorporated, here in Little Rock, working as a residential

15  treatment counselor.  I worked with psychiatrically disturbed

16  young people at that facility.  I -- under that setting, I

17  dealt with gang members, both male and female, that I worked

18  with at that facility.

19       After Youth Home, I was employed as a detention officer

20  with the North Little Rock Police Department when the jail was

21  operational in North Little Rock.  Once again, working with

22  gang members in that setting, both adults as well as

23  juveniles.

24       And then after my conclusion of employment with North

25  Little Rock, I was hired by the Little Rock Police Department,

1    and as we all start out, started out in the patrol division

2    and worked the East side of Little Rock, on the midnight

3    shift, for a couple of years, worked a lot of gang related,

4    narcotics related incidents.  I had five housing projects in

5    my patrol sector during that time period.

6        And due to the experience that I had gained from these

7    previous jobs, plus my experience with LRPD on patrol, when a

8    unit was formed in the mid '90s -- well, early '90s, I guess,

9    called the Zero Tolerance Task Force, I was asked to

10   participate in that, which I did.  It was an anti-gang, anti-

11   drug task force that was comprised of uniformed, non-uniformed

12   police personnel, and we worked citywide within the city of

13   Little Rock.

14       And at the conclusion of the Zero Tolerance Task Force, I

15   was asked to come to the intelligence unit and work gang

16   intelligence, which I have done since 1995.

17   Q   Okay.  So how long is it you've been working in gang

18   intelligence -- or working with gangs in --

19   A   If we're not just looking at the law enforcement aspect of

20   it, I've been working with gang members for around 25 years.

21   Q   Okay.  Do you give training on gang activity?

22   A   Yes.  I've -- of course, as everyone else, I started out

23   attending trainings, and attended numerous gang schools

24   throughout the United States, including Advanced Gang

25   Investigations in Jacksonville, Florida.  But, yes, you are

1  correct, now I have gotten to the point now where I instruct.

2  I teach for the Little Rock Police Department, at the Little

3  Rock Police Academy, for the Department of Community

4  Corrections, and also the Department of Homeland Security, on

5  gangs.  I'm also an instructor with the Criminal Justice

6  Institute, as well.

7  Q    Okay.  And have you testified as an expert on gangs in

8  federal and state court?

9  A    Yes.  In state court, in both adult and juvenile cases,

10  and in federal court, as well.  That is correct.

11  Q    Okay.  And during your time investigating gang activity,

12  have you come across Nathaniel Smith?

13  A    Yes, we have met on numerous occasions.

14  Q    Okay.  Can you tell the Court the intelligence that you've

15  gained on Mr. Smith during your time?

16  A    The first indication that my division, which is the

17  special investigations division, has on file is from 1993,

18  when Nathaniel Smith was stopped in the area of 20th and

19  Valentine with numerous other subjects that had been

20  identified as members of the Monroe Street Hustlers, which is

21  one of our local Blood gangs.  I, myself, however, did not

22  have -- start having personal contact with Nate until about

23  1994.  And that contact lasted, off and on, through Zero

24  Tolerance and through my working with the street narcotics

25  unit, as well, during the mid to late '90s.

1  Q   Okay.  And did you receive, during that time, intelligence

2  on Mr. Smith's affiliation with the Monroe Street Hustlers and

3  his position in that gang?

4  A   Over the years, we have developed through other

5  investigations and, you know, ongoing investigations that

6  state and federal agencies have going on against gang activity

7  here within the city of Little Rock, we are current -- we are

8  constantly receiving information on gang activity, the gangs

9  themselves, their structure, their organization, and their

10 membership.  And starting as early as 1993, actually, before I

11 first met Mr. Smith, we had developed information that he was

12 a member at that time.  But then we have developed information

13 since then that he was actually one of the original gangsters

14 or the OGs, as they're called, which means that he was one of

15 the founding members of this particular gang that was reported

16 to have been formed in 1989, and that he has maintained that

17 rank within the gang up to this date.

18 Q   Okay.  And can you just describe the -- I guess the

19 reputation that this gang has on the street?

20 A   Well, during my entire time -- time period working gangs

21 with the Little Rock Police Department, we have dealt with

22 members of the Monroe Street Hustlers as both victims and as

23 suspects in numerous homicides and shootings here within the

24 city of Little Rock.  Federal agencies have conducted

25 narcotics investigations, weapons investigations on his gang,

1   as well as others.  And we are currently having issues with

2   the Monroe Street Hustlers and other rival Blood gangs, and

3   part of that had to do with a flurry of killings that we had

4   here in the city around the end of 2013 and the beginning of

5   this year.

6   Q    Okay.  And has there actually been a task force

7   established?

8   A    Yes, I'm currently assigned to Operation Cease Fire, which

9   is LRPD's attempt to reduce our homicide rate that we have

10  ever increasing here in the city of Little Rock.

11  Q    Okay.  And during your time researching gangs, can you

12  tell the Court about tattoos or ways that gang members

13  identify themselves with gangs?

14  A    Tattoos are one of the mainstays of our gang members, and

15  gang members around the country and around the world, for that

16  matter.  A lot of times they are used to mourn the dead,

17  identify the person as a member of a particular gang.  And we

18  use tattooing for identification purposes.  It's a great

19  intelligence tool that we utilize.  It gives us information on

20  nicknames, on gang affiliation, all sorts of different types

21  of information we can get from that.

22  Q    Okay.  And did you review certain tattoos on Mr. Smith?

23  A    Yes, I did.

24  Q    And were some of those tattoos of interest to you?

25  A    Yes, they were.

1          MS. BRYANT:  May I approach, Your Honor?

2          THE COURT:  You may.

3          MS. BRYANT:  May I have one moment, Your Honor?

4          THE COURT:  You may.

5          MS. BRYANT:  May I approach, Your Honor?

6          THE COURT:  You may.

7          THE WITNESS:  May I bug you for some water?

8          MS. BRYANT:  Yes.

9          THE WITNESS:  Thank you.  I know that's not one of

10    your job duties, but I appreciate it.  Thank you.

11    BY MS. BRYANT:

12    Q   Okay.  I'm showing you Government's Exhibit 1, 2, and 3.

13    Are these tattoos that you have actually observed on Mr.

14    Smith?

15    A   No, I was -- I was advised that these were tattoos taken

16    of -- or I'm sorry -- photographs taken of his tattoos during

17    his time of contact during the course of this investigation.

18    Q   Okay.  Do you -- you, based on your experience, have an

19    understanding of what these tattoos mean; is that correct?

20    A   Yes.  Yeah, that is correct.

21          MS. BRYANT:  Your Honor, I'd move for the admission

22    of Exhibit 1, 2, and 3.  And I know Ms. Driggers wanted to

23    make sure that they were actually photographs of Mr. Smith, so

24    I can put Detective Hurd back on to say she was there when

25    those photos were taken.

1          THE COURT:  Let me ask, Ms. Driggers, what say you?

2          MS. DRIGGERS:  I just don't think they've been

3   authenticated yet, but I don't have any objection to him

4   testifying about what the tattoos mean in his opinion, but I

5   think we need Detective Hurd to say that those were tattoos

6   that she saw on Mr. Smith.  And we haven't heard that yet.

7          THE COURT:  All right.

8          THE WITNESS:  Do you want to do that now or --

9          MS. BRYANT:  How would you like me to proceed?  Do

10  you want me to --

11         THE COURT:  Go ahead and finish your testimony and

12  then Officer Hurd -- or Detective Hurd can come back.

13         MS. BRYANT:  Okay.

14  BY MS. BRYANT:

15  Q   And do you know them well enough that if you give the

16  judge a copy you can explain them?

17  A   I believe so.  I may get them out of order, but.

18         THE COURT:  Here, I can hold them up.

19         MS. BRYANT:  Okay.

20         THE COURT:  I've got Exhibit 1.

21  BY MS. BRYANT:

22  Q   Exhibit No. 1, can you explain to the Court what that

23  means?

24  A   Exhibit No. 1 is -- are the letters OG on Mr. Smith's

25  chest.  In the gang culture, OG stands for original gangster,

1  which not only would be informative for us if we didn't have

2  any background information on Mr. Smith, but the fact that we

3  have longstanding documentation on his gang, and that is the

4  rank that he maintains and is documented as in this gang, is

5  telling to me that we've got our information correct.  If he

6  was considered a young member of the gang, he would have YG on

7  him, which would be young gangster.  But the letters OG, for

8  original gangster, put him as one of the founding members of

9  his particular gang.

10  Q   Okay.  So, if you're a founding member, how do you rank, I

11  guess, in the hierarchy of that gang?

12  A   You're in the upper echelon of that gang.

13  Q   Okay.  Let's talk about Exhibit No. 2.

14  A   The bottom part of it is a little bit fuzzy, I think I

15  know what it says, but -- but since I'm guessing at this

16  point, I won't even really go on what the bottom says.  The

17  top of, it says Mr. Nate, which is part of his gang alias,

18  which is Big Nate, he's gone by that in his neighborhood for

19  years.  And he has that tattooed on his -- on his abdomen.

20      Once again, as I said, this is one of the reasons why we

21  review tattoos, because a lot of -- a lot of the gang members,

22  especially when they were young gang members, would put their

23  nicknames on their -- on their bodies.  A lot of them,

24  however, over the years, have figured out that we use that

25  stuff to identify them as suspects and things of that nature,

1  so a lot of them over the years, especially with the older

2  gang members, will either go and have those covered up, you

3  know, let's say if they don't really affiliate that much

4  anymore, or anything like that, or they will actually change

5  nicknames to something that they're not known by, by local law

6  enforcement.

7  Q   Okay.  And let's talk about Exhibit No. 3.

8  A   That appears to be on the back of his neck.  It is the

9  word omerta, which is actually Italian.  The actual

10  translation for omerta is manhood, if you just looked at --

11  looked at it in an Italian dictionary.  However, the common

12  usage of omerta is a code of silence.  And basically what that

13  entails is that if you are man, you do not bring outside

14  officials, law enforcement, the courts, things of that nature,

15  into any type of conflict you have with others.  So, for

16  example, if you are attacked and you are let's say stabbed,

17  under the omerta code, you, or someone that you assign to

18  carry it out, would carry out an act of revenge against the

19  subject that did this to you without you notifying law

20  enforcement, without you cooperating with law enforcement,

21  going and getting warrants, testifying in court, and things of

22  that nature.  Omerta also has a very -- very strict part when

23  it comes to giving information to law enforcement, being an

24  informant or a snitch, you know, whatever kind of street term

25  you want to use, and that is considered the worst of the worst

1  under that particular code.  We see tattoos like this on some

2  of our -- some of our street gang members because they've

3  gotten that term from shows having to do with what we would

4  consider La Cosa Nostra or Italian or Sicilian based organized

5  crime, like the Godfather movies or the Sopranos, things of

6  that nature, and they have incorporated some of those sayings

7  that they've seen and heard in those films and shows into

8  their gang culture.

9  Q   Okay.  What about are there any other tattoos around that

10  tattoo on the back of his neck?

11  A   No.  It's a standalone word, which, to me, would give it

12  more meaning.  If it was -- if it was folded into something

13  else, you know, a picture of something, or other words, or

14  something of that nature, but the fact that a word meaning

15  code of silence is what is tattooed on the back of your neck,

16  communicates to me that that's a very overt, something he

17  wants possibly seen by others, wants them to see that tattoo,

18  know what it means, and know the ramifications of that

19  particular word.

20          MS. BRYANT:  Thank you.  That's all I have, Your

21  Honor.

22          THE COURT:  Cross?

23                      CROSS EXAMINATION

24  BY MS. DRIGGERS:

25  Q   Detective Hurd, it's possible to be affiliated with a gang

1  but not be active, right?

2  A    That is correct.

3  Q    And isn't that -- isn't it true that a lot of times people

4  who may have been active in a gang in their youth, later grow

5  up and don't have any involvement at all?

6  A    That is true.  However, one of the issues that a lot of

7  the gang members, and especially gang members that are Mr.

8  Smith's age, is these guys -- I mean, we were both a lot

9  younger back in the early '90s, you know, age has affected all

10 of us.  And so, we don't do the things like we used to, you

11 know.  So, we're not finding Mr. Smith standing on the corner,

12 throwing gang signs, he's not wearing gang colors, things of

13 that nature.  There is a fairly predictable aging out process

14 of some of the more overt gang activity.  But what we have

15 found though is that as the gang members get older, especially

16 Little Rock's first generation, of which Mr. Smith would be

17 considered one of Little Rock's first generation gang members,

18 is that they will continue contact and affiliation with

19 members of the gang; which we have information, you know, as

20 of fairly recently, as to his contact, plus the fact, too, he

21 also has family members that are also affiliated, as well,

22 which makes it even more difficult -- if he was to, say,

23 decide that he was not going to affiliate and be done with the

24 gangs, it's even more difficult when you actually have close

25 family members that are also affiliates and members.

1  Q    So, it's fair to say then that if someone has tattoos all

2  over their body --

3  A    Uh-huh.

4  Q    -- so they're marked with this gang --

5  A    Uh-huh.

6  Q    -- they've got family members in a gang --

7  A    Uh-huh.

8  Q    -- they're seen with family members who are in the gang --

9  A    Correct.

10 Q    -- but it's hard to tell whether or not they're actually

11 gang banging or they're just hanging out with family?

12 A    Well, one of the things that we have seen consistently

13 from the gang members that have made a decision to sever ties

14 with the gangs is that many of them, the vast majority of

15 them, will actually go in and have those tattoos covered up

16 with other tattoos.  For example, we had several subjects that

17 stopped affiliating with one of our particular gangs, and they

18 had tattoos of the gang name on their chests, and as all of

19 these guys decided to get out of the gang, they all went and

20 got a ball and chain tattoo, which was very dark, it covered

21 up that original tattoo, and they quit affiliating.  So,

22 that's the norm for people who actually cease affiliating with

23 a gang, is that they try to -- they try to sever the things

24 that they've done to themselves to identify themselves as a

25 gang member, because if they don't, then every time they get

T. Hurd - Cross                                    84

1   up and they look in the mirror on a daily basis, there is that

2   gang affiliation basically staring them in the face.

3   Q    Right.  Did I hear you say that you have information that

4   Mr. Smith is personally involved or active in a gang?

5   A    Yes.  He is a member of the Monroe Street Hustlers.

6   Q    I get that he's a member, okay, that he's got the tattoos,

7   but is he actually out there committing crimes with gang

8   members?

9   A    Well, as I said, one of the things that happens is the

10  criminal activity changes as gang members get older.

11  Q    I get that, but that's not what I asked you.  I asked you

12  --

13  A    Well, it refers to that, because we are not seeing him out

14  there on the corner selling crack cocaine to people driving

15  up.  He's not, you know, putting a bandana over his face and

16  doing the drive-by shooting, things of that nature.  But one

17  of the things that we are seeing consistently with this first

18  generation is a change over in the type and level of criminal

19  activity that they are taking part in.  It's less overt.  It's

20  more -- I hate to use the word smarter, but they're not

21  putting themselves in as many situations as our 16 or 17 and

22  18 year old gang members are doing.  They're -- they're still

23  committing criminal activities, but they're doing it on a --

24  and I'm not trying to compliment them -- but on a more

25  intelligent, on a higher, more organized level.

1  Q    Does Mr. Smith have an open case in your division or your

2  office where somebody is investigating him right now?

3         MS. BRYANT:   Judge, I think that could compromise any

4  investigation that they would have.  I think the fact that he

5  said that they have information that he's involved in the gang

6  is enough.  I don't think he can talk about ongoing criminal

7  investigations.

8         THE WITNESS:   I actually could just a little bit.

9         THE COURT:   I figured he would.  So, I -- I'd ask it

10 a different way, but go ahead, Detective.

11        THE WITNESS:   Actually, there was some information

12 that came out of one of these interviews of one of these

13 victims that we are currently looking in to and following up

14 on regarding some of these acts of violence that we had around

15 the last part of last year and the first part of this year

16 between members of the Monroe Street Hustlers and members of

17 the Highland Park Pirus, the Westside Pirus, and the Oak

18 Street Pirus.

19 BY MS. DRIGGERS:

20 Q    And that information came from one of these girls?

21 A    There was information that came out just through the

22 course of this interview and it was -- it was reportedly a

23 statement that Mr. Smith made to one of the girls.  And at

24 this point, it's -- it's kind of vague.

25 Q    Okay.

1  A    But, you know, I'm being completely honest with you --

2  Q    Okay.

3  A    -- it is something that we are looking in to, due to the

4  timing and things of that nature.

5  Q    Okay.  Have you ever talked to Mr. Smith about any of

6  this?

7  A    I haven't talked to him personally in quite a few years.

8  I've spoken to his sister on a few occasions.

9  Q    So the information that you're talking about today is just

10 based on your opinion of what his tattoos mean and what his

11 involvement is?

12 A    Well, we have documentation going back to -- like I said,

13 my division has documentation going back to 1993 of LRPD

14 contact, but we have interviews with members of his gang that

15 have come out during other federal investigations that

16 identify him as a member of a gang, of this particular gang,

17 the Monroe Street Hustlers, that he was a founding member,

18 that he's an OG, and that he has been a member of the gang

19 since 1989.  So, no, ma'am, I am giving my opinion on what the

20 tattoos mean -- now, omerta, you -- that's -- it's a word, you

21 can look all that stuff up.  OG is a common term, and I am

22 doing some interpretation with that.  The Mr. Nate, that's

23 documented, as well.  So, it's a little bit of a mix.

24 Q    But before this arrest and before these girls were

25 interviewed, were you investigating him for gang activity?

1  A   Yes, ma'am.

2  Q   Okay.  So you're saying then that there's more --

3  A   He has been -- he has -- when we investigate a gang, it is

4  ongoing.  And he has been ongoing -- under an umbrella of

5  ongoing investigations since we found out that he was a gang

6  member in the early 1990s.

7  Q   Is he currently facing any charges for any of this

8  information?

9  A   There is -- like I said, there is currently some inquiries

10  being made regarding some of the acts of violence that

11  occurred the first part of this year, last part of last year,

12  but I can't really tell you how that's going to work out,

13  because, like I said, it's -- it's fairly fresh --

14  Q   Sure.

15  A   -- information that we didn't have until just here

16  recently.

17        MS. DRIGGERS:  Okay.  I don't have any other

18  questions.  Thank you.

19        THE COURT:  Redirect?

20        MS. BRYANT:  No, Your Honor.

21        THE COURT:  Detective, the address, 2307 South

22  Harrison, is that in the Hustler neighborhood or --

23        THE WITNESS:  No, that's the -- it's my understanding

24  that's the family home, and has been for quite some time.  I

25  think his sister uses the same home address, as well.  If you

1  go back though to the time frame of the early and mid '90s,

2  there were addresses that were used by the family that were

3  within the traditional territory of the Monroe Street

4  Hustlers.

5          THE COURT:  Okay.  So, to your knowledge, Mr. Smith

6  didn't grow up on that Harrison address?

7          THE WITNESS:  No.  No.  We do not have information

8  that would reflect that.  And it is also uncommon for these

9  guys of his age to remain living in the traditional territory

10  of their gangs.  They get older.  They have children.  And

11  they many times will move outside the gang area, just for

12  their safety and comfort, you know, because as part of being a

13  gang member, not only are you running the risk of being a

14  suspect in some type of act of violence, you are also running

15  the risk of being a victim.

16          THE COURT:  I understand.  Any follow up questions

17  based on my questions?

18          MS. DRIGGERS:  No, Your Honor.

19          MS. BRYANT:  No, Your Honor.

20          THE COURT:  All right.  You may stand down,

21  Detective.  Thank you.

22          THE WITNESS:  Thank you.

23      (Witness stands down.)

24          THE COURT:  Let me address the photographs, Exhibits

25  1, 2, and 3.  Detective Hurd, are they from Mr. Smith?

1          MS. JENNIFER HURD:  Yes, they are.

2          THE COURT:  All right.  And --

3          MS. BRYANT:  I believe Detective Hurd took them.

4          MS. JENNIFER HURD:  I took them.

5          THE COURT:  You took the photographs?

6          MS. JENNIFER HURD:  Yes.

7          THE COURT:  All right.  Is that fair enough?

8          MS. DRIGGERS:  Yes, Your Honor.

9          THE COURT:  All right.  I hate to keep our Marshals

10   and everybody else standing by here.  So, all right, they're

11   admitted then.

12      (Government's Exhibits No. 1, 2, and 3 identified and

13   received.)

14          THE COURT:  And is there any other witnesses?

15          MS. BRYANT:  No, Your Honor.

16          THE COURT:  All right.  For the defense?

17          MS. DRIGGERS:  No, Your Honor.

18          THE COURT:  Would you like to make argument?

19          MS. BRYANT:  Yes.

20          THE COURT:  All right.  Why don't you all make

21   argument and I'll take a brief recess again.  I don't want to

22   keep everybody here waiting in limbo here, but I need to make

23   a decision.  So, for the prosecution, I'll let you go first.

24          MS. BRYANT:  Your Honor, I think today we're positing

25   both that Mr. Smith is a danger to the community and he's a

1  risk of flight.  I know we have to show that he's a risk of

2  flight by the preponderance of the evidence.  And I would

3  submit to the Court that the testimony about Mr. Smith

4  basically making every excuse to try to not to have to come to

5  court, saying that his arm hurts, he has a heart -- he's

6  having heart problems, yet when he goes to the hospital he

7  doesn't complain about his heart.  He clearly had nothing

8  wrong with his heart, because the diagnose was of joint pain.

9  I would submit that he was doing everything possible to avoid

10 having to come to court today, to the extent that he's lying

11 about problems to not have to come to court.  And I think that

12 proves he's a risk of flight.  He also has a fleeing

13 conviction from 1996.

14         But we're really resting our hat on the fact that Mr.

15 Smith is a danger to the community.  The Court looked at his

16 extensive criminal history, I believe he has over five

17 possession -- possessions of a controlled substance

18 convictions.  He also has one state conviction for felon in

19 possession.  And then he also has a federal conviction for

20 being a felon in possession of a firearm.

21         The Court heard the testimony from Detective Hurd

22 about Mr. Smith's extensive involvement in the gang.  He's

23 actually a founding member of it.  The Court heard about the

24 violence that comes with that gang.  Mr. Smith is a danger to

25 the community being a part of that gang, and the gang is also

1    a danger to Mr. Smith.

2            The Court heard the testimony from Detective Hurd

3    that all of the victims stated that Mr. Smith carries a

4    firearm.  And I know that we missed the gun that day, but one

5    of the victims described that gun to a tee, and they found it

6    the next day.  There was also ammunition in the room that Mr.

7    Smith had rented under his name, as well as a slit in the bed,

8    which all of the girls told Detective Hurd that that's where

9    he hid his gun.

10           Your Honor, he was arrested on April 29th, he bonds

11   out, for trafficking of persons, of the two girls who

12   testified -- one testified she was beyond afraid.  Detective

13   Hurd told you they were all scared of him.  They talked about

14   the punishment that he put on them, the physical, the mental

15   punishment.  He's arrested, bonds out on the first, and within

16   two weeks, he's doing the exact same thing again.  He's

17   already recruited another girl to work for him.  And then he's

18   arrested.

19           I just think there is not a set of conditions that

20   this Court can put on him that would prevent him from being a

21   danger to the community, especially to the women.  He recruits

22   these girls, he makes them work for him, and if they don't

23   meet their quota of 500 dollars a day, he beats them.  I think

24   Ms. Lee, he was screaming at her to keep her mouth shut.  He

25   was telling the detectives that these girls aren't going to

1  come to court.  I think there is only one way he knows that,

2  it's either because he's scared them to not come, or if he

3  gets out, he's going to make sure that they don't come.  And

4  we'd ask this Court to detain him.

5          Thank you.

6          THE COURT:  For the defense?

7          MS. DRIGGERS:  Thank you, Your Honor.

8          First, I'd just like to point out that the Government

9  does have the burden in this case.  And not only do they have

10  the burden, but they -- we're also at the stage where this is

11  a criminal complaint, so this hasn't even been presented to a

12  grand jury.  And what we have heard today is pretty much

13  evidence of the Government's case, which they have a right to

14  present, but we don't have any of those witnesses here to hear

15  from them.  We also don't have their recordings, the

16  statements that they gave.  I mean, conveniently, we have the

17  recording of Mr. Smith, but we're not in a position where we

18  can get discovery and listen for ourselves as to what these

19  girls really said.  So, their credibility is key.  We just

20  don't know much about that right now.

21          So, if the Government's reliance on the strength of

22  their evidence is their reason for detaining him, I would just

23  ask the Court to be mindful that pre-complaint -- you know,

24  he's not even been indicted and this isn't a jury trial, this

25  isn't to decide whether or not he's guilty of all these acts.

1          And with regard to his criminal history, many of

2   these convictions are dated.  And we would concede that, you

3   know, from the age of 16, he's been in trouble with the law,

4   but he's not 16 anymore.

5          And as documented in the Pretrial Report, and even in

6   his Presentence Report, he has a history of drug use and

7   mental health.  So, I don't believe it's really fair for

8   officers to opine whether or not Mr. Smith's statements that

9   were made in a room at the detective division or at a room in

10   the hospital are malingering or exaggerating, when they don't

11   know his history.  But we have it documented here that he does

12   have a history of paranoia and drug use.  And we don't know if

13   he was high.  We don't know what was going on with him that

14   evening.  We don't know what was going on with him the day

15   that he was arrested.  And it's just too much speculation to

16   automatically point the finger that he's trying to flee from

17   court or trying to escape some kind of responsibility here.

18          He needs help.  He needs treatment.  And we're asking

19   the Court to release him on the strict condition that he go to

20   inpatient rehabilitation for a period of 90 days, followed by

21   chemical free living.

22          We do have family here to support him, but we're not

23   even going to try to put them on the witness stand to accept

24   that responsibility to get him help, because we know that

25   that's bigger than something they can handle right now.

1        Again, we stipulated that in the report he's had

2   trouble with supervision before, so we're making that

3   conscious effort not to put his family in a position where

4   they would have to supervise him.

5        We're asking the Court to send him to a

6   rehabilitation center where he can get some real help for both

7   his mental health and his medical treatment and his drug

8   history.  But he needs to be ready to fight these charges when

9   and if an indictment comes down.

10       And we feel like right now the Government just hasn't

11  proven that he's a danger to the community.  There are some

12  conditions out there that can be imposed.

13       Thank you.

14       THE COURT:  All right.  I'll take a brief recess, I

15  don't want to delay us any longer, and we'll be right back.

16    (Recess.)

17                      AFTER RECESS

18       THE COURT:  All righty.  Ms. Driggers has done a good

19  job attacking the strength of the case.  And, you know, these

20  cases are inherently difficult because of the fact that

21  ultimately it's going to come down to the credibility of the

22  witnesses.  And you've done a really good job of challenging

23  that.  However, at this juncture, on that point, I think that

24  Detective Hurd -- Detective Jennifer Hurd has met her -- I

25  don't know what you would call it -- but she has countered

1   that with her testimony.  She's got a long history of being a

2   detective, for one, and she's got specific training in this

3   area.  And I, frankly, credit her assessment at this juncture.

4   I think that where that goes is, ultimately, the Government is

5   going to present their case to the grand jury, and if my

6   suspicion is right, they would bring in the witnesses into the

7   grand jury, and the grand jury would make an ultimate

8   determination, unlike we're able to do here, where they're

9   able to actually view the credibility of the witnesses.  So, I

10  -- I credit your point on that.  I kind of find it almost a

11  draw.

12          So where I look to next is really kind of what the

13  characteristics and the history of Mr. Smith.  And, you know,

14  that's not good.  Mr. Smith, you have a pretty lengthy

15  criminal history, a lot of guns in your history, a lot of

16  violence in your criminal history.  I think that the Exhibit

17  5, the threats made to the police, I think the detective's

18  statements, his testimony regarding the threats toward the

19  victims gives me very serious concern that if I were to

20  release you, we haven't had testimony where the -- the alleged

21  victims are, but I would be very concerned of you being out,

22  as well as them on -- on the block at this point.

23          The gun, I find that there's credible evidence that

24  the gun belonged to Mr. Smith.  Specifically, the Springfield

25  .45.

1          I'm sorry I got confused on that, Detective Hurd.

2   But it was very important to me to make sure that I understood

3   that.  And I went back and forth on it; frankly, I was like,

4   wow, that gun belonged to Mr. Smith, and then, because of my

5   poor questioning, I thought, okay, well, I don't know who the

6   gun belonged to, so I'm not going to hold that against Mr.

7   Smith, but then the redirect I think confirmed the fact that

8   you had a witness who specifically testified about the

9   Springfield .45, and it being found in the -- the hotel room

10  that is, you know, maybe not in his name, but it's surely tied

11  to Mr. Smith and his activities.

12          I'm concerned that, you know, he's out on bond.  And

13  what's he doing?  Immediately back in the game.  You know,

14  that's really kind of what we're doing here, right, we're

15  saying, hey, you're in trouble, we're going to release you.  I

16  think that, you know, based on these actions of his and these

17  different arrests here, all close in time, indicate that he

18  would be somebody who would likely go out and go right back

19  into criminal activity despite whatever condition that I would

20  set.

21          He's given false statements to the Pretrial Service

22  Officer, the first part about him being employed.  And then

23  the officer calling the -- the employer and them saying, you

24  know, he hasn't worked here in a long time.  As I know you

25  know, counsel, it's been in my court many times, the whole

1  release is based on a relationship of trust and communication.

2  And so, that -- that gives me cause of concern.

3       And then the gang testimony, although the defense,

4  you did -- you did a good job challenging Detective Hurd on

5  that, I think that it's pretty clear that he's an OG.  The

6  exhibit is very clear on that.  I don't know how all that ties

7  in, because I think there's more compelling reasons to detain

8  Mr. Smith at this point.  And the most compelling, like I say,

9  is his criminal history, the .45 caliber found in the hotel

10 room, and the Exhibit 5, and the detective's testimony about

11 the threats to the victim.  And Detective Bratton, his

12 testimony about the making the witnesses go away, I think

13 that's a real possibility and a real threat and something that

14 would weigh heavily on my mind were I to release to Mr. Smith.

15 I just don't -- ultimately, it comes down to a gut check, and

16 I just don't believe that I can release him on any conditions

17 to assure the safety of the community, particularly the

18 witnesses that are involved in this case.

19      I think that what we're looking at is, on the -- back

20 to the strength of the case, which I do credit defense on,

21 just largely because it's hard to tell in this context,

22 without actually live witnesses, to make credibility

23 determinations, and the credibility will be so important in

24 prosecuting this case.  I do believe that the Government will

25 have the opportunity to go to grand jury in the very near

1  future.  And, you know, if you're right, the case will

2  dissolve and then there won't be any basis to hold Mr. Smith

3  any longer.  But if the witnesses are credible, they'll have

4  an indictment, and I think that will be telling on the

5  strength of the case.  And so, I'm comfortable, given that

6  we're probably talking about a couple of weeks here time frame

7  for that to resolve itself.

8          So, and again, I do credit Detective Hurd's

9  testimony.  For the record, I do want to say that I credit

10 Detective Jennifer Hurd's testimony and I make note of the

11 fact that I do believe she's highly trained and I do believe

12 her in her assessment that these witnesses are credible, at

13 least at this juncture.

14         So, it's a long drawn out explanation, but I did want

15 to make a record of it.  I don't know what -- what the defense

16 wants to do with it, but, obviously, you're always welcome to

17 appeal any decision that I make, because I try to get them

18 right, but I don't often get them right -- or I don't always

19 get them right -- hopefully, I often get them right.

20         Those are my findings and my decision in this case.

21 So I find by clear and convincing evidence that he is a danger

22 to the community.  And I find by -- also, I do agree with the

23 prosecution, just because of the -- the instability, if you

24 will, and the dishonesty with the employment part, that was my

25 point on the risk of flight, I think the Government has

1   carried their burden on the preponderance of the evidence in

2   that matter.

3        Is there anything else then on behalf of Mr. Smith

4   that we need to take up today?

5        MS. DRIGGERS:  No, Your Honor.

6        THE COURT:  On behalf of the United States?

7        MS. BRYANT:  No, Your Honor.

8        THE COURT:  All right.  I commend counsel on both

9   sides for putting a very strong case on both sides together.

10   And we'll be adjourned.

11     (Adjournment at 5:31 p.m.)

12        ELECTRONIC SOUND RECORDING CERTIFICATION:

13   I, court approved transcriber, certify that the foregoing is a

14   correct transcript from the official electronic sound

15   recording of the proceedings in the above-entitled matter.

16

17   /s/Robin Warbritton           June 25, 2014
     Signature of Approved Transcriber   Date

18

19   Robin Warbritton
     Typed or Printed Name

20

21

22

23

24

25